IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JANE DOE, Individually and on behalf of all others similarly situated, | ) ) ) | CASE NO. |
| Plaintiff, | ) ) ) | JUDGE |
| v. | ) ) ) | |
| CRYSTAL CLINIC ORTHOPAEDIC CENTER, LLC D/B/A CRYSTAL CLINIC ORTHOPAEDIC CENTER, | ) ) ) ) | |
| Defendant. | ) ) | |

## NOTICE OF REMOVAL

Defendant Crystal Clinic Orthopaedic Center, LLC ("CCOC") removes this putative class action to the U.S. District Court for the Northern District of Ohio pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), as Plaintiff's claims challenge the legitimacy of actions CCOC has taken in accordance with directives from the federal government for the creation of a nationwide electronic health information infrastructure. In support of removal, CCOC provides the following "short and plain statement of the grounds for removal" under 28 U.S.C. § 1446(a).

## STATEMENT OF THE CASE

1. On April 22, 2024, Plaintiff filed a putative class action lawsuit in the Summit County Court of Common Pleas, entitled *Jane Doe, Individually, and on Behalf of All Others Similarly Situated v. Crystal Clinic Orthopaedic Center, LLC D/B/A Crystal Clinic Orthopaedic Center*, Case No. CV-2024-04-1722 (the "State Court Action"). A true and accurate copy of the original Class Action Complaint in the State Court Action is attached as **Exhibit A**.

2. On April 22, 2024, in the State Court Action, Plaintiff filed a Motion for Permission to Proceed Under a Pseudonym and Affidavit in Support of Motion for Permission to

Proceed Under a Pseudonym. A true and accurate copy of the motion is attached as **Exhibit B** and of the affidavit is attached as **Exhibit C**.

3. On April 26, 2024, Plaintiff filed an Amended Class Action Complaint in the State Court Action (the "Amended Complaint"). A true and accurate copy of the Amended Complaint is attached as **Exhibit D**.

4. The common pleas court granted the Motion for Permission to Proceed Under a Pseudonym on May 3, 2024. A true and accurate copy of the order is attached as **Exhibit E**.

5. CCOC received service of the Summons and original Class Action Complaint in the State Court Action via certified U.S. mail sent to its statutory agent on May 3, 2024.

6. CCOC received service of the Summons and Amended Complaint in the State Court Action via certified U.S. mail sent to its statutory agent on May 6, 2024.

7. Through undersigned counsel at Brouse McDowell, CCOC first received a copy of the original Class Action Complaint in the State Court Action on April 23, 2024 via the CNS Cleveland State Report.

## ALLEGATIONS OF AMENDED COMPLAINT

8. Plaintiff brought this lawsuit on behalf of herself and a putative class of "All Ohio Citizens whose Private Information was disclosed by [CCOC] to third parties through the Meta Pixel and related technology without authorization." (Amended Complaint at ¶ 221.)

9. In particular, Plaintiff alleges that "Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the 'Online Platforms'), to learn about CCOC on its main website page, to find physicians, and schedule appointments with them, and to find treatment services, to search for health information, to find locations, to access a patient portal, and more, such as to research accepted insurance plans, and

pay bills." (*Id*. at ¶ 8.)

10. Plaintiff further alleges that "Defendant knowingly configured and implemented into its website…code-based tracking devices known as 'trackers' or 'tracking technologies,' which collected and transmitted patients' Private Information to Facebook, and other third parties, without patients' knowledge or authorization." (*Id*. at ¶ 7.) Specifically, Plaintiff alleges that among the trackers that CCOC "embedded into its Website" was the Facebook Pixel known as "Meta Pixel," which she asserts was used to track visitors' "search terms, button clicks, and form submissions" and was linked to the visitor's "unique and persistent Facebook ID ('FID'), allowing a user's health information to be linked with their Facebook profile." (*Id*. at ¶ 12.)

11. According to Plaintiff, "Plaintiff and the Class Members visited Defendant's Online Platforms in relation to their past, present, and future health, healthcare and/or payment for health care." (*Id*. at ¶ 9.) As a result of these interactions, Plaintiff contends that "Defendant disclosed to Facebook the Private Information and communications that Plaintiff and the Class Members submitted to Defendant's Website, *inter alia*, the pages they viewed and the buttons they clicked, their keyword searches; location and physician searches; appointment request activities; other activities that revealed users' status as a patient such as on the pre-portal login; and identifying information such as IP addresses and 'c_user' cookies which Facebook uses to identify specific users." (*Id*. at ¶ 107; italics in original.) Among the information allegedly disclosed to Facebook, according to Plaintiff, was a user's accessing of the CCOC patient portal and the page on the CCOC website for paying medical bills. (*Id*. at ¶ 138, 144-145.)

12. Plaintiff alleges that the information CCOC purportedly shared with Facebook and other third parties constitutes "Personally Identifying Information" as defined by the Federal Trade Commission ("FTC"), and "Protected Health Information" under the Health Insurance

3

Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"). (*Id.* at ¶ 1; *see also* ¶ 179-192, 205.) According to Plaintiff, Defendant's actions violated the requirements of the HIPAA statute, and rules, regulations, standards and guidance promulgated by the federal Department of Health and Human Services and the FTC. (*Id.* at ¶ 1-2, 4-5, 179-192, 205.)

13. According to Plaintiff, "Defendant utilized data from these trackers to market their services and bolster their profits" and the information shared allowed "third parties (e.g., Facebook) to learn of a particular individual's health conditions and seeking of medical care" and "Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then target Plaintiff and Class Members with online advertisements, based on the information they communicated to Defendant via the Website." (*Id.* at ¶ 17, 19.)

14. Based on these allegations, Plaintiff seeks to bring this case as a putative class action (*id.* at ¶ 220-235), and asserts claims, on behalf of herself and others purportedly similarly situated, for: (1) breach of confidence / unauthorized disclosure of nonpublic medical information pursuant to *Biddle v. Warren General Hospital* (*id.* at ¶ 236-241); (2) negligence (*id.* at ¶ 242-250); (3) negligence *per se* (*id.* at ¶ 251-262); (4) invasion of privacy / intrusion upon seclusion (*id.* at ¶ 263-271); (5) breach of implied contract (*id.* at ¶ 272-283); (6) unjust enrichment (*id.* at ¶ 284-291); and (7) interception and disclosure of electronic communications in violation of Ohio Revised Code § 2933.52 (*id.* at ¶ 292-305.)

## THE FEDERAL OFFICER REMOVAL STATUTE AS BASIS FOR REMOVAL

15. The Federal Officer Removal Statute, 28 U.S.C. Code § 1442(a), permits removal when the defendant is "the United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, *for or relating to any act under color of such office* . . . ." *Id.* at § 1442(a)(1)

4

(emphasis added).

16. The statute is to be "liberally construed" and the "policy favoring removal 'should not be frustrated by a narrow, grudging interpretation.'" *In re: Nat'l Prescription Opiate Litigation*, 327 F.Supp.3d 1064, 1069 (N.D. Ohio 2018). "While some circuits have taken a more narrow view of removal under the Federal Officer Removal Statute, the Sixth Circuit has endorsed 'the broad scope of the federal officer removal statute,' and thus . . . interprets the statute broadly in favor of removal." *Id*. (citations omitted).

17. For a private actor that is not itself a federal officer, removal under the federal officer removal statute requires: (1) that the defendant "is a 'person' within the meaning of the statute who 'act[ed] under [a federal officer]'"; (2) that "it performed the actions for which it is being sued 'under color of [federal] office'"; and (3) that "it raised a colorable federal defense." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (brackets in original).

18. All these requirements are met here. As explained further below, the federal government since 2004, through a comprehensive program of executive order, legislation, and regulation, has directed a public-private initiative to develop a nationwide electronic infrastructure for accessing and interacting with healthcare information. As part of this, and in order to drive provider participation in the federal initiative, the federal government at first incentivized providers that participate in the Medicare and Medicaid program (including CCOC) to offer their patients online access to their healthcare records and establish websites that enable users to engage electronically with healthcare information. Later, to drive higher levels of participation in the federal program, the incentives became downward adjustments in reimbursements for medical services for providers who were not complying with the federal government's directives to provide online access to medical records and healthcare information.

It is because of CCOC's participation in the federal government's program and directions that it now faces the claims raised in Plaintiff's State Court Action.

### A. The Meaningful Use / Promoting Interoperability Program

19. The federal initiative formally began in 2004, when President George W. Bush issued an Executive Order establishing a National Health Information Technology Coordinator, now known as The Office of the National Coordinator for Health Information Technology (the "ONC"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Executive Order was to cause "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

20. Five years later, Congress codified the ONC in the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act"). 123 Stat. 115, 247 (2009) (codified at 42 U.S.C. § 300jj-31). At the same time, Congress also allocated billions of dollars to the Centers for Medicare & Medicaid Services ("CMS") to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

21. In furtherance of its mandate, the ONC published guidance for private providers to follow with respect to creating systems for electronic access of healthcare records, including through five-year strategic plans. In the 2015-2020 plan, the ONC dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://dashboard.healthit.gov/strategic-plan/federal-health-it-strategic-plan-2015-2020.php.

22. Subsequently, in the 2020-2025 plan, the ONC celebrated that the goal of collaboration with the private sector had already occurred, explaining: "The federal government and private sector have worked together to help digitize health information and healthcare." ONC, *Federal Health Information Technology Strategic Plan 2020-2025*, available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf.

23. A critical aspect of the strategy was CMS's "Meaningful Use" program, now referred to as the Promoting Interoperability Program. 42 C.F.R. § 495.2-495.370. This federal program aimed to increase patients' "meaningful use" and engagement with electronic health records. See CMS.gov, *Promoting Interoperability Programs*, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms ("In 2011, [CMS] established the Medicare and Medicaid EHR Incentive Programs [(now known as the Medicare Promoting Interoperability Program)] to encourage eligible professionals (EPs), eligible hospitals, and critical access hospitals (CAHs) to adopt, implement, upgrade, and demonstrate meaningful use of certified electronic health record technology (CEHRT)").

24. Through 2021, the promoting interoperability program offered incentive payments to providers participating in Medicare and Medicaid when they met specific criteria for increasing patient engagement with electronic health records. Now, however, participants that do not demonstrate "meaningful use" during reporting periods may suffer downward payment adjustments under Medicare. *See* CMS.gov, *2022 Medicare Promoting Interoperability Program Scoring Methodology Fact Sheet,* available at https://www.cms.gov/files/document/2022-scoring-methodology-fact-sheet.pdf.

25. The requirements imposed on providers include: adopting federally certified technology, giving patients electronic access to health records and physicians, making it easier for patients to access electronic health information via smartphones, and making the records downloadable and transferable. *See* CMS.gov, *2022 Medicare Promoting Interoperability Program Requirements*, available at https://www.cms.gov/regulations-guidance/promoting-interoperability/2022-medicare-promoting-interoperability-program-requirements.

26. To achieve those requirements, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. *See, e.g.,* ONC, *Patient Engagement Playbook*, available at https://www.healthit.gov/playbook/pe/introduction/ ("Patient portals hold enormous potential to improve patient care and practice workflow."). The ONC has further directed how providers can optimize such portals; "how a patient portal helps achieve meaningful use requirements"; and how a provider can "actively promote and facilitate portal use." ONC, *How to Optimize Patient Portals,* (2013), available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

27. In addition to this guidance, for CMS's own website, which includes an online portal for patients who access care through traditional Medicare, CMS relies on third-party marketers, including Google and Facebook. *See generally* Medicare.gov, Privacy Policy, https://www.medicare.gov/privacy-policy. For example, CMS engages Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of CMS website. [This] allows Facebook Ads to measure the performance of CMS advertisements based on

consumer activity and to report the ad performance to CMS." *See* HHS, *Third Party Websites and Applications Privacy Impact Assessment -- Facebook Ads* (Sept. 4, 2018), available at https://www.hhs.gov/pia/third-party-websites-and-applications-pia-facebook-ads.html.

### B. CCOC Is a "Person" Within the Meaning of the Federal Officer Removal Statute

28. By the plain terms of the federal officer removal statute, removal is permitted by "any person acting under that [federal] officer." 42 U.S.C. § 1442(a)(1).

29. Although the statute itself does not provide a definition for "person," organizations and corporate defendants have been permitted to remove under this statute as they have been determined to constitute "persons" within the meaning of the statute. *See, e.g., Bennett*, 607 F.3d 1076, 1085.

30. CCOC is a limited liability company (Amended Complaint at ¶ 31), and this type of organization qualifies as a person under the statute.

### C. CCOC Is Acting Under a Federal Officer

31. The requirement that the person be "acting under" a federal officer focuses on the relationship between the federal government and the private entity. It asks whether the entity is assisting or helping to carry out a federal officer's duties or tasks, and whether the relationship between the federal government and the private entity involves "detailed regulation, monitoring, or supervision." *Watson v. Philip Morris Co.*, 551 U.S. 142, 153 (2007). To satisfy this element, the private entity's actions "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id*. at 152 (emphasis in original); *see also Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 858 (6th Cir. 2023) (citations omitted).

32. In the Sixth Circuit, several factors have been deemed relevant to this analysis,

9

including (1) whether the entity is "helping the government to produce an item it needs"; (2) whether the federal government would handle the task on its own absent the private entity's involvement; (3) whether the government provided directives for how the work should be performed; and (4) whether the government closely monitored the private entity's performance. *Bennett*, 607 F.3d 1076, 1086-88.

33. Each of these factors supports that the federal government incentivized, regulated, monitored, and supervised the activities of providers (like CCOC) in order to *assist and carryout* the government's stated goal of creating a nationwide, interoperable information technology infrastructure for accessing and interacting with healthcare information. First, the federal government has candidly acknowledged the private sector's critical role in assisting the government's efforts, stating that "the federal government and private sector have worked together to help digitize health information and healthcare." See CMS, *Promoting Interoperability Programs*, 2020-2025 Strategic Plan.

34. Second, without the assistance of CCOC and of other providers throughout the country, the federal government would have been left to go it alone to implement its stated goal of a nationwide, interoperable system. As is supported by the government's own efforts to digitize information and allow for electronic engagement by Medicare beneficiaries, all indications point to the government endeavoring to act on its own if the private sector had not been involved from the outset.

35. Third, the government has directed providers on how best to enhance patient electronic access and engagement, including through the creation of website access and patient portals. In this regard, it has recommended how providers should design the portals, as well as how such providers should market to potential and actual patients the existence of online

resources and portals. In addition, through the federal government's own engagement with Google and Facebook on the CMS website, it has created a model for private entities to follow in configuring their own websites and portals.

36. Finally, the government has established an office dedicated to this effort and has closely monitored and supervised the work of private entities (like CCOC). It also has supervised and incentivized the providers' development of the information technology infrastructure first through incentives and then through downward payment adjustments—all in an effort to entice providers to act in the manner desired by the government.

37. These facts establish that the "acting under" prong has been satisfied. The Northern District of Ohio in *Doe v. ProMedica Health System, Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct, 20, 2020), concluded as much under substantially similar facts. In that case (as here), the plaintiff claimed that the defendant healthcare organization had improperly "released Plaintiff's private information through its on-line healthcare records" to "third-party marketers," including information regarding the plaintiff's use of the patient portal. *Id*. at *1. The defendant countered that it had "created the electronic-health-record patient portal primarily to assist the federal government in its mission for a nationwide system of electronic health records," and, "[i]n return, Defendant took advantage of federal incentives for setting up such a program." *Id*. at *2. The Northern District of Ohio agreed that under these circumstances, the defendant "satisfied the 'acting under' prong," because the "Defendant's participation assisted the federal government in achieving [the] goal" of creating the nationwide electronic health records system. *Id*. at *2-3. The same conclusion is compelled here.[1]

---

[1] CCOC acknowledges the existence of contrary authority which rejects the Northern District's analysis in *ProMedica*. *See e.g.*, *Martin v. LCMC Health Holdings, Inc.*, No. 23-30522, 2024 WL 2125510 (5th Cir. May 13, 2024); *Mohr v. Trustees of the Univ. of Pa.*, 93 F.4th 100 (3d Cir. 2024); *Doe v. BJC Health System*, 89 F.4th 1037 (8th Cir. 2023); *Doe v. Mosaic Health System*, 2024 WL 2239301 (8th Cir. May 17, 2024); *Doe v. The Christ Hosp.*, Nos.

### D. Plaintiff's Claims Relate to the Actions Under Color of Federal Office

38. Under Section 1442(a)(1), the conduct at issue must have been taken "under color of [federal] office." 28 U.S.C. § 1442(a)(1). This means that there must be a "nexus, a 'causal connection' between the charged conduct and [the] asserted official authority." *Bennett*, 607 F.3d 1076, 1088 (brackets in original). "In other words, the removing party must show that it is being sued because of the acts it performed at the direction of the federal officer." *Id*. Thus, "[i]n the corporate context, a corporation needs to show that the acts for which it is being sued occurred because of what it was asked to do by the Government." *In re: Nat'l Prescription Opiate Litigation*, Nos. 1:17-md-2804, 1:20:-OP-45233, 1:19-OP-45696, 2023 WL 166006, at *5 (N.D. Ohio Jan. 12, 2023) (citations omitted). In the Sixth Circuit, the "hurdle erected by this requirement is quite low." *Bennett*, 607 F.3d 1076, 1088 (citations omitted).

39. As described above, Plaintiff's Amended Complaint is focused on CCOC's alleged use of analytical tools on its website and of marketing companies in connection with CCOC's patient portal and public website. (*See*, *e.g.*, Amended Complaint at ¶ 7 ("Defendant knowingly configured and implemented into its website…code-based tracking devices known as 'trackers' or 'tracking technologies,' which collected and transmitted patient's Private Information to Facebook, and other third parties, without patients' knowledge or authorization"), ¶ 107 ("Defendant disclosed to Facebook the Private Information and communications that Plaintiff and the Class Members submitted to Defendant's Website, *inter alia*, the pages they viewed and the buttons they clicked, their keyword searches; location and physician searches; appointment request activities; other activities that revealed users' status as a patient such as on

---

1:23-cv-27, 1:23-cv-31, 1:23-cv-87, 2023 WL 4757598 (S.D. Ohio Jul. 26, 2023). Appeals on the availability of federal officer removal in similar putative class actions are also currently pending in other U.S. Circuit Courts of Appeal.

the pre-portal login; and identifying information such as IP addresses and 'c_user' cookies which Facebook uses to identify specific users.").)

40. As the Northern District recognized in *ProMedica*, 2020 WL 7705627, the "claims alleged by Plaintiff implicate Defendant's electronic-health-record patient portal, and Defendant's handling of this electronic information is central to the claims in this claim." *Id*. at *3. Accordingly, in the Northen District's estimation as stated in *ProMedica*, "[t]here is plainly a connection or association between [the healthcare provider's] website management and marketing strategies and the [federal government's] Meaningful Use program, particularly the incentives that are tied to patient participation and usability." *Id*. (citations omitted). In such circumstances, a nexus exists between the federal government's program and requirements and the ensuing conduct of CCOC which serves as the alleged basis for Plaintiff's claims.

### E. CCOC Raised Colorable Federal Defenses to Plaintiff's Claims

41. Finally, CCOC must show that it will raise a colorable federal defense. This requirement also sets a low bar, as it requires that a "colorable federal defense need only be plausible" and a "district court is not required to determine its validity at the time of removal." *Bennett*, 607 F.3d 1076, 1089; *In re: Nat'l Prescription Opiate Litigation*, 327 F.Supp.3d 1064, 1077.

42. In the Amended Complaint, Plaintiff relies upon federal statutes and regulations to establish that CCOC purportedly shared protected, private healthcare information with third parties; namely, that the information shared was recognized as "Personally Identifying Information" by the FTC and as "Protected Health Information" under HIPAA. (Amended Complaint at ⁋ 1; *see also* ⁋ 2, 4-5, 179-192, 199-206, 253, 258.)

43. CCOC intends to defend itself by countering Plaintiff's allegations that the

13

information allegedly shared with third parties constituted protected information under the federal statutory and regulatory schemes upon which Plaintiff relies. In addition, Defendant will argue federal preemption based on these federal statutes and regulations. Such defenses, which involve the interpretation and application of federal law, are "sufficient to raise a colorable federal defense for purposes of the federal removal statute." *ProMedica*, 2020 WL 7705627, at *3.

44. Because each of the four requirements for federal officer removal have been satisfied, removal to this Court on these grounds is proper.

## **PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN MET**

45. All of the statutory requirements for removal to this Court under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1446 have been satisfied.

46. Pursuant to 28 U.S.C. § 1441(a), venue in this District is proper because it is the "district and division embracing" Summit County, Ohio, "the place where such action is pending."

47. Pursuant to 28 U.S.C. § 1446(a), CCOC has attached all process, pleadings, and orders filed in the State Court Action as Exhibits A through E.

48. Pursuant to 28 U.S.C. § 1446(b), this Notice is timely filed, as it is filed within 30 days of CCOC's receipt of the original Class Action Complaint.

49. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal will be served upon Plaintiff's counsel and promptly filed in the Summit County Court of Common Pleas.

50. By filing this Notice of Removal, CCOC does not waive, and expressly reserves, its right to raise any and all of its procedural and/or substantive defenses.

51. CCOC reserves the right to amend or supplement this Notice of Removal.

WHEREFORE, CCOC gives notice that the State Court Action pending against it in the Summit County Court of Common Pleas is removed to this Court.

>Respectfully submitted,
>
>/s/ Lisa S. DelGrosso
>Christopher F. Swing (0055793)
>Lisa S. DelGrosso (0064938)
>BROUSE McDOWELL
>388 South Main Street, Suite 500
>Akron, OH 44311
>Tel. (330) 535-5711
>Fax (330) 253-8601
>CSwing@brouse.com
>ldelgrosso@brouse.com
>
>David Sporar (0086640)
>BROUSE McDOWELL
>600 Superior Avenue East, Suite 1600
>Cleveland, OH 44114
>Tel. (216) 830-6830
>Fax (216) 830-6807
>DSporar@brouse.com
>
>*Attorneys for Defendant Crystal Clinic Orthopaedic Center, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of May, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.  In addition, a copy of the foregoing was emailed to counsel for Plaintiff as follows:

Caleb Harbison
J. Gerald Stranch, IV
Andrew E. Mize
Stranch, Jennings & Garvey, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200

Nashville, Tennessee 37203
charbison@stranchlaw.com
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops
Mary Kate Dugan
Cohen & Malad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss
Raina Borelli
Turke & Strauss, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
sam@turkstrauss.com
raina@turkstrauss.com

                                                           /s/ *Lisa S. DelGrosso*
                                                           Lisa S. DelGrosso (0064938)

[1841148]