## IN THE COURT OF COMMON PLEAS
## SUMMIT COUNTY, OHIO

| | |
|---|---|
| **JANE DOE, Individually, and on behalf of all others similarly situated,** c/o STRANCH, JENNINGS & GARVEY, PLLC 223 Rosa L. Parks Avenue, Suite 200 Nashville, Tennessee 37203 <br><br> **Plaintiff,** <br><br> v. <br><br> **CRYSTAL CLINIC ORTHOPAEDIC CENTER, LLC D/B/A CRYSTAL CLINIC ORTHOPAEDIC CENTER** c/o Registered Agent for Service of Process BROUSE MCDOWELL, INC. 388 South Main Street, Suite 500 Akron, Ohio 44311 <br><br> **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> JURY DEMAND <br><br> Case No. _____ |

### CLASS ACTION COMPLAINT

Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated, brings

this Class Action Complaint against Defendant, CRYSTAL CLINIC ORTHOPAEDIC CENTER,

LLC D/B/A CRYSTAL CLINIC ORTHOPAEDIC CENTER (hereinafter, "CCOC" or

"Defendant"), and alleges, upon personal knowledge as to her own actions, and upon information

and belief as to all other matters, as follows.

### INTRODUCTION

1.     Plaintiff brings this class action to address Defendant's outrageous, illegal, and

widespread practice of disclosing the confidential Personally Identifying Information[1] ("PII")

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or

Exhibit A

and/or Protected Health Information[2] ("PHI") (collectively referred to as "Private Information") of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe Audience Manage, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, OpenX, and potentially others ("the Disclosure").

    2.    The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant,' that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[3] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not

---

government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). CCOC is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last accessed March 21, 2024), **attached as Exhibit A.**

avoidable by and largely unknown to users."[4] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[5]

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable

---

[4] *Id.*
[5] *Id.*

3

protected health information to a third party without express written authorization.

5.    On March 18, 2024, HHS updated its December 2022 bulletin,[6] reiterating: **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[7,8]

6.    Headquartered in Akron, Ohio, Defendant is a massive "physician-owned" medical system which provides orthopaedic care and treatment to patients throughout Ohio, under a mission of "provid[ing] patient centered, high quality, value based, orthopaedic, musculoskeletal and reconstructive care to improve or restore the function and enhance the lifestyle of the patients [it] serve[s]."[9]

7.    Despite its unique position as a massive and trusted healthcare provider, Defendant knowingly configured and implemented into its website, https://www.crystalclinic.com/ (the "Website") code-based tracking devices known as "trackers" or "tracking technologies," which collected and transmitted patients' Private Information to Facebook, and other third parties, without patients' knowledge or authorization.

---

[6] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last acc. Apr. 15, 2024).

[7] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").

[8] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Updated March 18, 2024), avail at. https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis in original) (last acc. Apr. 15, 2024).

[9] https://www.crystalclinic.com/about/mission (last accessed Apr. 15, 2024).

*Tavia Galonski, Summit County Clerk of Courts*

CV-2024-04-1722    MICHAEL KATHRYN    04/22/2024 14:41:42 PM    CMCO    Page 5 of 104

8.    Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to learn about CCOC on its main website page,[10] to find physicians, and schedule appointments with them,[11] to find treatment services,[12] to search for health information,[13] to find locations,[14] to access a patient portal,[15] and more, such as to research accepted insurance plans,[16] and pay bills.[17]

9.    Plaintiff and the Class Members visited Defendant's Online Platforms in relation to their past, present, and future health, healthcare and/or payment for health care.

10.    When Plaintiff and Class Members used Defendant's Websites and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook and others into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

11.    A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[18] When a person visits a website with an tracker, it tracks "events" (i.e., user interactions with the site), such

---

[10] https://www.crystalclinic.com/ (last accessed Apr. 15, 2024).

[11] https://www.crystalclinic.com/physicians (last acc. Apr. 15, 2024).

[12] E.g., "Hand and wrist care," avail. at https://www.crystalclinic.com/services/hand-and-wrist (last acc. Apr. 15, 2024).

[13] E.g., search for "pain," avail. at https://www.crystalclinic.com/?s=pain (last acc. Apr. 15, 2024).

[14] https://www.crystalclinic.com/locations (last acc. Apr. 15, 2024).

[15] https://www.crystalclinic.com/patient-information/patient-portal (last acc. Apr. 15, 2024).

[16] https://www.crystalclinic.com/patient-information/accepted-insurance (last acc. Apr. 15, 2024).

[17] https://www.crystalclinic.com/patient-information/billing-info/online-bill-pay (last acc. Apr. 15, 2024).

[18] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

as pages viewed, buttons clicked, and information submitted.[19] Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[20]

      12.    Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[21] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[22] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[23]

      13.    Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff's and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their

---

[19] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[20] *Id.*

[21] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).

[22] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[23] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

6

authorization or knowledge.

14.     Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[24]

15.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.[25, 26]

16.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[27]

17.     Defendant utilized data from these trackers to market their services and bolster their

---

[24] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

[25] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).

[26] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).

[27] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

18.    On information and belief, the information that Defendant's Meta Pixel, and possibly CAPI, sent to Facebook included the Private Information that Plaintiff and the Class Members submitted to Defendant's Websites and Online Platforms, including, *inter alia*, the pages they viewed and the buttons they clicked; their keyword searches; location and physician searches; appointment request activities; other activities that revealed users' status as a patient; and identifying information such as IP addresses and "c_user" cookies which Facebook uses to identify specific users.

19.    Such information allows third parties (e.g., Facebook) to learn of a particular individual's health conditions and seeking of medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then target Plaintiff and Class Members with online advertisements, based on the information they communicated to Defendant via the Website. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

20.    In addition to the Facebook Pixel, and likely CAPI, on information and belief, Defendant installed other tracking technologies, which operate similarly to the Meta Pixel and transmitted Plaintiff's and Class Members' Private Information to unauthorized third parties.

21.    Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising

8

revenue.

22.     Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or other third parties uninvolved in their treatment.

23.     Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, Defendant have never disclosed to Plaintiff or Class Members that it shared their Information with Facebook, and possibly others, including Google, Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe Audience Manage, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, OpenX, and potentially others

24.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

25.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

26.     Upon information and belief, CCOC utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

27.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

28.     Defendant breached its common law and statutory obligations to Plaintiff and Class

9

Members by, *inter alia*, (i) failing to adequately review their marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor their Website to maintain the confidentiality and integrity of patient Private Information.

29.    Plaintiff seeks to remedy these harms and brings causes of action for (I) Breach of Confidence, Unauthorized Disclosure of Nonpublic Medical Information, pursuant to *Biddle v. Warren Gen. Hosp.*, 1999-Ohio-115, 86 Ohio St. 3d 395, 715 N.E.2d 518 (1999); (II) Negligence; (III) Negligence *Per Se*; (IV) Invasion of Privacy—Intrusion Upon Seclusion; (V) Breach of Implied Contract; (VI) Unjust Enrichment; and, (VII) Interception and Disclosure of Electronic Communications in Violation of R.C. § 2933.52.

**PARTIES**

30.    Plaintiff, JANE DOE (hereinafter, "Plaintiff"), is a natural person and a resident and citizen of Ohio where she intends to remain, with a principal residence in North Canton, Stark County, Ohio. Plaintiff has been a patient of Village since October of 2022, and is a victim of Defendant's unauthorized Disclosure of Private Information.

31.    Defendant, CRYSTAL CLINIC ORTHOPAEDIC CENTER, LLC D/B/A CRYSTAL CLINIC ORTHOPAEDIC CENTER (hereinafter, "CCOC" or "Defendant") is a limited

liability company organized and existing under the laws of the State of Ohio with its principal

place of business at 3975 Embassy Parkway, Suite 102, Akron, Ohio, in Summit County.

32. CCOC's Registered Agent for Service of Process is Brouse McDowell, Inc., 388

South Main Street, Suite 500, Akron, Ohio 44311.

## JURISDICTION & VENUE

33. This Court has subject matter jurisdiction over this action under R.C. § 2305.01 and

R.C. § 1345.04

34. This Court has personal jurisdiction over Defendant because it is incorporated

under Ohio law, its principal place of business is in this State, and the acts and omissions giving

rise to Plaintiff's claims occurred in this State.

35. Venue is proper in Summit County under Ohio Civ. R. 3(C)(2) because

Defendant's principal place of business is in this county.

## COMMON FACTUAL ALLEGATIONS

### A. Background

36. Based in Akron, Ohio, Defendant is a hospital system which provides orthopaedic

medical and surgical care and treatment to patients throughout Northeast Ohio under a vision of:

> ...be[ing] the destination point for orthopaedic, musculoskeletal and reconstructive
> care. This will be accomplished by a broad complement of specialists using a
> patient-centered service focus, and both standardized and innovative value based
> approaches to care delivery, with emphasis on the right care, the right cost, the right
> provider, the right facility, and the right outcomes.[28]

37. CCOC represents to patients and prospective patients that it, "...brings together

Greater Akron's most respected group of orthopedic surgeons at locations convenient for you. The

Center's board-certified surgeons have the training and knowledge to improve your quality of life.

---

[28] https://www.crystalclinic.com/about/mission (last acc. Apr. 15, 2024).

Tavia Galonski, Summit County Clerk of Courts

Most physicians have additional specialty-specific fellowship training."[29]

38.     Defendant provides patients with comprehensive orthopedic medical and surgical services, including Foot and Ankle care,[30] Hand and Wrist care,[31] Hand Therapy,[32] Hip care,[33] diagnostic imaging ("• Digital X-ray • Bone Densitometry (DEXA or DXA) • Computed Tomography (CT) • Ultrasound • Magnetic Resonance Imaging (MRI), including 1.5T and 3.0T MRI scanners for high-quality, detailed images"),[34] knee care,[35] Pain Management,[36] Physical Medicine & Rehabilitation,[37] Physical Therapy,[38] Pediatric Orthopaedics,[39] Plastics and Reconstruction,[40] Shoulder and Elbow care,[41] Spine care,[42] Sports Medicine,[43] "QuickCare,"[44] and even Telehealth care.[45]

39.     CCOC's surgeons "…perform more than 15,500 surgeries each year" alone.[46]

40.     Defendant provides these orthopedic medical services at numerous locations in the Greater Akron, Ohio area. As CCOC describes, "[m]ore than 50 board-certified orthopedic and plastic/ reconstructive physicians provide care at two surgical locations and 18 outpatient clinics

---

[29] *Id.*
[30] https://www.crystalclinic.com/services/foot-and-ankle (last acc. Apr. 15, 2024).
[31] https://www.crystalclinic.com/services/hand-and-wrist (last acc. Apr. 15, 2024).
[32] https://www.crystalclinic.com/services/hand-therapy (last acc. Apr. 15, 2024).
[33] https://www.crystalclinic.com/services/hip (last acc. Apr. 15, 2024).
[34] https://www.crystalclinic.com/services/imaging (last acc. Apr. 15, 2024).
[35] https://www.crystalclinic.com/services/knee (last acc. Apr. 15, 2024).
[36] https://www.crystalclinic.com/services/pain-management (last acc. Apr. 15, 2024).
[37] https://www.crystalclinic.com/services/physical-medicine-rehabilitation (last acc. Apr. 15, 2024).
[38] https://www.crystalclinic.com/services/physical-therapy (last acc. Apr. 15, 2024).
[39] https://www.crystalclinic.com/services/pediatric-orthopaedics (last acc. Apr. 15, 2024).
[40] https://www.crystalplasticsurgeons.com/ (last acc. Apr. 15, 2024).
[41] https://www.crystalclinic.com/services/shoulder-and-elbow (last acc. Apr. 15, 2024).
[42] https://www.crystalclinic.com/services/spine (last acc. Apr. 15, 2024).
[43] https://www.crystalclinic.com/services/sports-medicine (last acc. Apr. 15, 2024).
[44] https://www.crystalclinic.com/services/quickcare (last acc. Apr. 15, 2024).
[45] https://www.crystalclinic.com/services/telehealth (last acc. Apr. 15, 2024).
[46] https://www.crystalclinic.com/about

in Northeast Ohio. We provide onsite physical and occupational therapy and have high-level imaging services, such as MRI, extremity MRI and bone density scans."[47]

41.      Indeed, Defendant owns and operates Crystal Clinic Orthopaedic Center Hospital located at 3557 Embassy Parkway in Fairlawn, Ohio, where it provides patients with orthopaedic services including Orthopedic Surgery, Plastic and Reconstructive Surgery, Physical Therapy, Inpatient Post-Surgical Care, Imaging: X-ray and MRI, and a QuickCare Ortho. Clinic.[48]

42.      In addition, CCOC provides services at numerous other locations, including at Crystal Clinic Orthopaedic Center in Fairlawn, Ohio (pain management services, orthopedic care, imaging, physical medicine and rehabilitation, physical therapy, and outpatient surgery at "Fairlawn I," and hand and wrist orthopaedic care, hand therapy, imaging/x-ray, and plastic and reconstructive care at "Fairlawn II"),[49] as well as at "Crystal Clinics" in Ashtabula,[50] Barberton,[51] Canton,[52] Cuyahoga Falls,[53] Green,[54] Hudson,[55] Independence,[56] Kent,[57] Lyndhurst,[58] Medina,[59] Solon,[60] Wadsworth,[61] and Warren, Ohio.[62]

---

[47] https://www.crystalclinic.com/about/careers (last acc. Apr. 15, 2024).
[48] https://www.crystalclinic.com/locations/ccochospital (last acc. Apr. 15, 2024).
[49] https://www.crystalclinic.com/locations/montrose-i (last acc. Apr. 15, 2024); https://www.crystalclinic.com/locations/montrose-ii (last acc. Apr. 15, 2024).
[50] https://www.crystalclinic.com/locations/ashtabula (last acc. Apr. 15, 2024).
[51] https://www.crystalclinic.com/locations/barberton (last acc. Apr. 15, 2024).
[52] https://www.crystalclinic.com/locations/canton (last acc. Apr. 15, 2024).
[53] https://www.crystalclinic.com/locations/cuyahoga-falls (last acc. Apr. 15, 2024).
[54] https://www.crystalclinic.com/locations/green (last acc. Apr. 15, 2024).
[55] https://www.crystalclinic.com/locations/hudson (last acc. Apr. 15, 2024).
[56] https://www.crystalclinic.com/locations/independence-i (last acc. Apr. 15, 2024); https://www.crystalclinic.com/locations/independence-ii (last acc. Apr. 15, 2024).
[57] https://www.crystalclinic.com/locations/kent (last acc. Apr. 15, 2024).
[58] https://www.crystalclinic.com/locations/lyndhurst (last acc. Apr. 15, 2024).
[59] https://www.crystalclinic.com/locations/medina (last acc. Apr. 15, 2024).
[60] https://www.crystalclinic.com/locations/solon (last acc. Apr. 15, 2024).
[61] https://www.crystalclinic.com/locations/wadsworth (last acc. Apr. 15, 2024).
[62] https://www.crystalclinic.com/locations/warren (last acc. Apr. 15, 2024).

Tavia Galonski, Summit County Clerk of Courts

43.     Further still, CCOC touts itself as being "nationally renowned" for orthopaedic

care, being:

- **One of just 3 hospitals of the 6,120 in the nation** to receive The Joint Commission certifications in total hip, total knee, total shoulder and spinal fusion procedures
- **Ranked #1 in Ohio and the top 1% in the U.S.** by CareChex/Quantros Analytics
- **A recipient of the nation's highest 5-star rating** in patient experience from the Centers of Medicare and Medicaid Services
- Known for expert, advanced specialty care by **board-certified / board-eligible surgeons**, most with advanced fellowship credentials in their orthopaedic specialty, who collectively perform more than 17,000 surgeries annually
- One of the only hospital systems in the world with a highly advanced, **state-of-the-art surgical hospital** devoted exclusively to orthopaedic and plastic / reconstructive care[63]

44.     Orthopaedic medical treatment is big business, with CCOC generating annual

revenue approximating $98 million in 2023.[64]

45.     Defendant serves many of its patients via its Website and Online Platforms, which

it encourages  patients to use to learn about CCOC on its main website page,[65] to find physicians,

and schedule appointments with them,[66] to find treatment services,[67] to search for health

information,[68] to find locations,[69] to access a patient portal,[70] and more, such as to research

---

[63] https://www.crystalclinic.com/about/nationally-renowned (last acc. Apr. 15, 2024).
[64] https://www.zippia.com/crystal-clinic-orthopaedic-center-careers-20627/revenue/ (last acc. Apr. 15, 2024).
[65] https://www.crystalclinic.com/ (last accessed Apr. 15, 2024).
[66] https://www.crystalclinic.com/physicians (last acc. Apr. 15, 2024).
[67] E.g., "Hand and wrist care," avail. at https://www.crystalclinic.com/services/hand-and-wrist (last acc. Apr. 15, 2024).
[68] E.g., search for "pain," avail. at https://www.crystalclinic.com/?s=pain (last acc. Apr. 15, 2024).
[69] https://www.crystalclinic.com/locations (last acc. Apr. 15, 2024).
[70] https://www.crystalclinic.com/patient-information/patient-portal (last acc. Apr. 15, 2024).

*Tavia Galonski, Summit County Clerk of Courts*

accepted insurance plans,[71] and pay bills.[72]

46.     In furtherance of its goal of increasing sales and profitability, and to improve the success of its advertising and marketing, Defendant purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiff and Class Members to further its marketing efforts. But Defendant did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiff and Class Members, with Facebook and other unauthorized third parties.

47.     To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.     *Facebook's Business Tools and the Meta Pixel*

48.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[73]

49.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

50.     Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

51.     The Business Tools are automatically configured to capture "Standard Events" such

---

[71] https://www.crystalclinic.com/patient-information/accepted-insurance (last acc. Apr. 15, 2024).
[72] https://www.crystalclinic.com/patient-information/billing-info/online-bill-pay (last acc. Apr. 15, 2024).
[73] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[74] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[75]

52.     One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[76] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

53.     Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as Defendant's "Physicians" page[77]).

54.     The Meta Pixel's primary purpose is for marketing and ad targeting and sales generation.[78]

55.     Facebook's own website informs companies that "[t]she Meta Pixel is a piece of

---

[74]Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[75] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra.*
[76] Retargeting, META, https://www.facebook.com/business/goals/retargeting.
[77] https://www.crystalclinic.com/physicians (last acc. Apr. 16, 2024)
[78] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

16

code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[79]

56.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** (emphasis added).

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[80]

57.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales.** Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[81]

58.    Facebook likewise benefits from the data received from the Meta Pixel and uses the

---

[79] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

[80] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

[81] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

*Tavia Galonski, Summit County Clerk of Courts*

data to serve targeted ads and identify users to be included in such targeted ads.

   *ii.*   ***Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel***

   59.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

   60.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

   61.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[82]

   62.    GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

   63.    When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of

---

[82]"Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

"Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

64.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

65.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

66.     Defendant's implementation of the Meta Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendant.

67.     Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the patient associated with the Private Information it has intercepted.

68.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the

19

information travels directly from the entity's server to Facebook's server.

69.     Conversions API "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[83] Thus, the entity receives and stores its communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

70.     Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

71.     While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[84] Thus, if an entity implemented the Meta Pixel in accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website.

72.     The third parties to whom a website transmits data through pixels and other tracking technology do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (i.e., to bolster profits).

73.     Accordingly, without any knowledge, authorization, or action by a user, a website

---

[83] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).
[84] See Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

Tavia Galonski, Summit County Clerk of Courts

owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

74.     In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

75.     Consequently, when Plaintiff and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

76.     CCOC also employed other trackers, including Google DoubleClick Ads, Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe Audience Manage, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, and OpenX, which, on information and belief, likewise transmitted Plaintiff's and the Class Members' Private Information to third parties without their knowledge or authorization.

### iii.    Defendant Violated its own Privacy Policies

77.     CCOC maintains and is covered under privacy policies, including a Notice of Privacy Practices,[85] website Terms and Conditions,[86] a website Privacy Policy[87] ("Website

---

[85] *Notice of Privacy Practices*, effective May 2009, revised March 26, 2013, avail. at https://www.crystalclinic.com/hipaa-notice-of-privacy-practices (last acc. Apr. 15, 2024) **attached as Exhibit B.**

[86] *Terms and Conditions*, last updated Apr. 22, 2011, avail. at https://www.crystalclinic.com/terms-and-conditions (last acc. Apr. 15, 2024) **attached as Exhibit C.**

[87] *Privacy Policy*, last updated Feb. 19, 2016, avail. at https://www.crystalclinic.com/privacy (last acc. Apr. 15, 2024) **attached as Exhibit D.**

21

Privacy Policy") and a Cookies Notice,[88] which are posted on Defendant's Website (collectively, "Privacy Policies").

78. In its Notice of Privacy Practices, CCOC states, "[t]he terms of this Notice of Privacy Practices apply to Crystal Clinic Orthopaedic Center, Crystal Clinic Inc., any entities or facilities owned by or affiliated with Crystal Clinic Orthopaedic Center and the Medical Staff and their dependent practitioners (collectively referred to as 'Crystal Clinic Orthopaedic Center'). These entities and people operate together as a clinically integrated health care arrangement…"[89]

79. Therein, Defendant acknowledges, represents, and promises that it:

> …**is required by law to maintain the privacy of our patients' personal, protected health information** and to provide patients with notice of our legal duties and privacy practices with respect to your personal, protected health information. **We are required to notify you if there is a breach of your unsecured protected health information. We are required to abide by the terms of this Notice so long as it remains in effect.**[90]

80. In the Notice of Privacy Practices, CCOC specifically promises that:

> Except as outlined below, we will not use or disclose your personal, protected health information for any purpose unless you have signed a form authorizing the use or disclosure. **Most uses and disclosures of your health information for marketing purposes and disclosures that constitute a sale of your health information require your authorization.**[91]

81. Moreover, in the Notice of Privacy Practices, Defendant enumerates specific purposes for which it may disclose health information/PHI without authorization, *inter alia*, for:

- Treatment ("We will make uses and disclosures of your personal, protected health information as necessary for your treatment…);

---

[88] *Cookies Notice*, avail. at https://www.crystalclinic.com/cookies-notice (last acc. Apr. 15, 2024) **attached as Exhibit E.**
[89] *Notice of Privacy Practices*, **Exhibit B.**
[90] *Id.* (bold emphasis added).
[91] *Id.* (bold emphasis added).

22

- Payment ("We will make uses and disclosures of your personal, protected health information as necessary for the payment purposes of those health professionals and facilities that have treated you or provided services to you... ");

- Health Care Operations ("We will use and disclose your personal protected health information as necessary and as permitted by law, for our health care operations that include clinical improvement, professional peer review, business management, accreditation and licensing, etc...");

- In a Patient Directory;

- To family and friends involved in patient care ("With your approval, we may disclose your personal, protected health information to designated family, friends, and others who are involved in your care or in payment of your care in order to facilitate that person's involvement in caring for you or paying for your care. [...] We may also disclose limited personal, protected health information to a public or private entity that is authorized to assist in disaster relief efforts in order for that entity to locate a family member or other persons that may be involved in some aspect of caring for you.");

- To Business Associates ("Certain aspects and components of our services are performed through contracts with outside persons or organizations such as auditing, accreditation, legal services, etc. At times it may be necessary for us to provide some of your personal, protected health information to one of or more of these outside persons or organizations who assist us with our health care operations. In all cases, we require these business associates to appropriately safeguard the privacy of your information.");

Tavia Galonski, Summit County Clerk of Courts

CV-2024-04-1722    MICHAEL, KATHRYN    04/22/2024 14:41:42 PM    SMCO    Page 24 of 104

- For fundraising ("We may contact you to donate to a fundraising effort for or on our behalf. You have the right to 'opt-out' of receiving fundraising materials or communications and may do so by sending your name and address to the Privacy Officer […] together with a statement that you do not wish to receive fundraising materials or communications from us.");

- "[T]o provide appointment reminders or information about treatment alternatives or other health-related benefits and services that may be of interest to [patients;]"

- To communicate with patients "about health products and services necessary for [their] treatment, to advise [them] of new products and services we offer, and to provide general health and wellness information[;]" and,

- for research purposes in limited circumstances, stating "[i]n all cases where your specific authorization is not obtained, your privacy will be protected by strict confidentiality requirements applied by an Institutional Review Board that oversees the research, or by representations of the researchers that limit their use and disclosure of patient information." [92]

82.    In addition, under Defendant's Notice of Privacy Practices, CCOC may disclose patients' health information/PHI for the following purposes, without their written authorization:

- For any purpose required by law;
- For public health activities, such as required reporting of disease, injury, and birth and death, and for required public health investigations;
- As required by law if we suspect child abuse or neglect; we may also release your personal, protected health information as required by law if we believe you to be a victim of abuse, neglect, or domestic violence;
- To the Food and Drug Administration if necessary to report adverse events, product defects, or to participate in product recalls;
- To your employer when we have provided health care to you at the request of your employer; in most cases you will receive notice that information is

---

[92] *Id.*

*Tavia Galonski, Summit County Clerk of Courts*

disclosed to your employer;
- If required by law to a government oversight agency conducting audits, investigations, or civil or criminal proceedings;
- If required to do so by a court or administrative ordered subpoena or discovery request; in most cases you will have notice of such release;
- To law enforcement officials as required by law to report wounds and injuries and crimes;
- To coroners, medical examiners, and/or funeral directors consistent with the law;
- If necessary to arrange an organ or tissue donation from you or a transplant for you;
- If you are a member of the military as required by armed forces services; we may also release your personal, protected health information if necessary for national security or intelligence activities;
- To workers' compensation agencies if necessary for your workers' compensation benefit determination. RIGHTS THAT YOU HAVE.[93]

83.    None of the purposes set forth in Defendant's Notice of Privacy Practices for which it may disclose patients' PHI without authorization includes the disclosure of Private Information to third parties uninvolved in their treatment for marketing purposes as occurred in the Disclosure.

84.    In addition, Defendant maintains a Website Terms and Conditions, in which CCOC informs patients and prospective patients that, "[b]y accessing, browsing and/or using web pages or other digital content in this site, you accept, without limitation or qualification, the following terms of use."[94]

85.    Therein, CCOC goes onto inform Website users that "[y]ou agree that your use of the Crystal Clinic Orthopedic Center website and any uses of any services or materials are subject to your agreement with all of these Terms of Use and the Website Privacy Policy..." and directs them to "read the full text of our Notice of Privacy Practices to understand how any Protected Health Information ("PHI"), as that term is defined in the Notice of Privacy Practices (HIPAA),

---

[93] *Id.*
[94] *Terms and Conditions*, **Exhibit C.**

that you submit via the Crystal Clinic Orthopedic Center website will be treated."[95]

86.    Moreover, in its Terms and Conditions, Defendant represents and promises patients and prospective patients that: " SECURITY. All forms that request personal information (name, address, E-mail address, etc.) are secure and provide encrypted transmission over the Internet. Please refer to our Website Privacy Policy for more information concerning encryption technology utilized by Crystal Clinic Orthopedic Center."[96]

87.    Nothing in CCOC's website Terms and Conditions permits Defendant to disclose Private Information to third-parties for marketing purposes without their written authorization.

88.    As referred to in the Terms and Conditions, Defendant also maintains a Website Privacy Policy in which CCOC states that "…we understand, acknowledge and respect any individual's right to privacy and the concerns one may have in regard to privacy and security. We recognize the importance of protecting the privacy of information provided by our patients, as well as general users of our website," and notes that the "Notice of Privacy Practices [Exhibit B] is a separate document that governs how medical information about you may be used and disclosed by [CCOC]."[97]

89.    Therein, CCOC unambiguously states, **BY USING THIS WEBSITE, YOU ACCEPT THESE TERMS."**[98]

90.    In its Website Privacy Policy, Defendant specifically acknowledges, represents, and promises patients and prospective patients that:

**PERSONAL INFORMATION**

**A visitor can access and browse our entire site at any time without providing**

---

[95] *Id.*
[96] *Id.*
[97] *Privacy Policy*, **Exhibit D.**
[98] *Id.* (bold, capitalization in original)

*Tavia Galonski, Summit County Clerk of Courts*

**any personal information. We do not collect information that would personally identify you unless you choose to provide it.**

In addition, Crystal Clinic Orthopaedic Center does not share any personally identifiable information of any individual with any third party unrelated to Crystal Clinic Orthopaedic Center, except in situations where we must provide information for legal purposes or investigations, or if so directed by the patient through a proper authorization. [99]

91.    Moreover, therein Defendant states that it **"collects non-personal information such as website usage, traffic patterns, site performance and related statistics based on our tracking of your visits to the website."** [100]

92.    In the Website Privacy Policy, CCOC discloses that the Website collects IP addresses, which it contends "…**is not truly personally identifiable information because many different individuals can access the Internet via the same computer" and which Defendant uses "in aggregate form to understand how our site is being used and how we can better serve visitors."** [101]

93.    However, in the same breath, CCOC admits that, "…although such information is not personally identifiable, we can determine from an IP address a visitor's Internet Service Provider and the geographic location of his or her point of connectivity."[102]

94.    In its Website Privacy Policy, Defendant too explains that its Website utilizes "first party cookies" to collect information about users, and that these **"[c]ookies are never associated with specific personal identities [and] are distinct from third party cookies in that they are created and directly served by the company hosting the website."**[103]

---

[99] *Id*. (bold emphasis in original; underline emphasis added).
[100] *Id*. (bold emphasis in original).
[101] *Id*. (bold emphasis in original).
[102] *Id*.
[103] *Id*. (bold emphasis in original)

*Tavia Galonski, Summit County Clerk of Courts*

CV-2024-04-1722     MICHAEL, KATHRYN     04/22/2024 14:41:42 PM     SMCO     Page 28 of 104

95.    CCOC states that it uses two (2) types of first party cookies, "persistent cookies to recognize a repeat visitor, enabling us the opportunity to offer the visitor a set of services or information requested in a previous visit [and…] session cookies to track a visitor's path through our site during a visit to help us understand how people use our site."[104]

96.    Additionally, in the Website Privacy Policy, Defendant promises that:

**SECURITY OF YOUR INFORMATION**

**Please note that our forms are encrypted to protect your privacy. Once the information is sent to our site, it is kept in secure databases where it is not available to users on the Internet. While we sometimes ask for credit card numbers or certain service transactions, and either pass them on to a credit card processing service or process them manually, we do not store credit card numbers online.**

Crystal Clinic Orthopaedic Center periodically reviews and modifies, where appropriate, its security policies and procedures. We use reasonable care to protect your personally identifiable and confidential information provided by you to our site. Crystal Clinic Orthopaedic Center has in place a security program that seeks to mitigate this risk substantially. [105]

97.    Nothing in CCOC's Website Privacy Policy alerts users, patients and prospective patients, that Defendant utilizes the Meta Pixel and other tracker on its Online Platforms which disclose their PHI/Private Information to third-parties for marketing purposes, without their written authorization.

98.    Lastly, Defendant maintains a Cookies Notice, which "…describes technologies Crystal Clinic Orthopaedic Center may use when you visit and navigate the websites of crystalclinic.com and crystalplasticsurgeons.com or access their subdomains."[106]

99.    In the Cookies Notice, CCOC represents that:

**Crystal Clinic is committed to full transparency and to protecting personal**

---

[104] *Id.* (bold type in original removed)
[105] *Id.* (bold emphasis in original; underline emphasis added)
[106] *Cookies Notice,* **Exhibit E.**

*Tavia Galonski, Summit County Clerk of Courts*

**information.** We are providing this Cookies Notice so that you can fully understand how we may collect and store information on our online properties through the use of cookies, pixel tags, and local objects (collectively referenced as "Cookies" in this notification). You will find descriptions of why and how we use these Cookies and, of utmost importance, how you are always able to disable them if you so choose.[107]

100.   In fact, therein, Defendant specifically represents and promises that, "Cookies may store certain information such as your internet protocol ('IP') address, operating system, device information, browser type and language, referring URLs, access times, pages viewed, links clicked, and other information about your activities or use of the online service. **Cookies used on Crystal Clinic websites and online properties DO NOT contain your protected personal health or medical information.**"[108]

101.   In its Cookies Notice, Defendant describes "Analytics Cookies" as "commonly used with web analytics services performed by third parties, such as Google Analytics [...which...] collect basic information for the purpose of analyzing and measuring how visitors use online services and specific functions and features. The information gathered can include the IP address, device ID, browser information, geolocation, content viewed, or other similar information that can aid website analytics."[109]

102.   Further, Defendant describes its "Marketing Cookies," stating that they:

...can be used to deliver advertisements based on your unique interests and preferences. These Cookies are also used to collect data when you have interacted with our online advertisements. Data we collect for advertising or marketing purposes includes information such as IP address, browser type, location (only to the municipality level of detail), date and time of visit, domain type, and activity while on the website. We may use marketing Cookies to help measure the effectiveness of advertising efforts by tracking clicks from our ads to one of our web pages or other Crystal Clinic online content. Any information collected and used by third parties for statistical or analytical purposes are described in that third

---

[107] *Id.*
[108] *Id.* (bold emphasis in original).
[109] *Id.*

29

party's privacy policies and Cookies notices.[110]

103.   However, with respect to these "Marketing Cookies," Defendant specifically promises in the Cookies Notice that: **NOTE: Crystal Clinic has elected not to use these types of Cookies to share any information with third party advertising or marketing partners to enable them to market to you. Nor do we permit any marketing partners to capture information that could be used to match and identify."**[111]

104.   Nothing in CCOC's Cookies Notice allows it to disclose patients' and prospective patients' PHI/Private Information to third-parties for marketing purposes, without their written authorization.

105.   Despite these express, specific representations and promises, CCOC does indeed transfer Private Information to third parties. Using the Meta Pixel, and other tracking technology, Defendant used and disclosed Plaintiff's and Class Member's Private Information and confidential communications to Facebook, and other unauthorized third parties, without written authorization, in violation of its Privacy Policies.

### iv.   *CCOC Unauthorizedly Disclosed Plaintiff's and the Class's Private Information*

106.   On information and belief, Defendant disclosed Plaintiff's and Class Members' Private Information and confidential communications to third parties for marketing purposes, including Facebook, Google, Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe Audience Manage, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, OpenX, and potentially others.

---

[110] *Id.*

[111] *Id.* (bold emphasis in original).

*Tavia Galonski, Summit County Clerk of Courts*

107.    Through the use of the Meta Pixel, Defendant disclosed to Facebook the Private Information and communications that Plaintiff and the Class Members submitted to Defendant's Website including, *inter alia,* the pages they viewed and the buttons they clicked, their keyword searches; location and physician searches; appointment request activities; other activities that revealed users' status as a patient such as on the pre-portal login; and identifying information such as IP addresses and "c_user" cookies which Facebook uses to identify specific users.

108.    CCOC started disclosing its users' data transmitted on the Website and Online Platforms to Facebook as early as July 8, 2020 and continues to do so today.

109.    CCOC first installed a Meta Pixel on its Website no later than July 8, 2020, ID 787574768447246 ("**Pixel1**") by adding the Pixel code to the Website HTML source code.

110.    Beginning at least as early as September 26, 2020, CCOC began to install ReachLocal/LocaliQ (rlets.com). Through ReachLocal, CCOC installed a second Meta Pixel with ID 225864609164585 ("**Pixel2**"). CCOC continues to install ReachLocal and Pixel2 today.

111.    Around June 20, 2021, CCOC removed Pixel1 and began to install a new Meta Pixel with ID 278596950344301 ("**Pixel3**"). Pixel3 was installed directly in CCOC's HTML source code.

112.    Then, starting around October 3, 2022, CCOC removed Pixel3 and began to install the Meta Pixel with ID 4726715507437398 ("**Pixel4**"). CCOC continued to install Pixel4 until at least December 4, 2023.

113.    Accordingly, CCOC started disclosing its users' data to Facebook as early as July 8, 2020 and continues to do so today.

114.    At the present time, CCOC has presently enabled "Protect Data Mode," which limits the amount of data disclosed to Facebook. However, this is a relatively new development

31

and does not represent the vast majority of CCOC's disclosures to Facebook.

115.    CCOC used its Meta Pixels to track users' browsing activities across its website. Upon a user's arrival on CCOC's homepage, CCOC would send a PageView event disclosing that the user loaded the page at URL "https://www.crystalclinic.com/."

116.    As users browsed CCOC's website beyond the homepage, CCOC continued to disclose information about users to Facebook. Through CCOC's transmission of PageView and SubscribedButtonClick events, CCOC disclosed information about users' keyword searches; location and physician searches; appointment request activities; other activities that revealed users' status as a patient; as well as identifying information including users' IP addresses and information transmitted via the "c_user" cookie.

### CCOC Disclosed Users' Keyword Searches

117.    As users conducted keywords searches on CCOC's website, CCOC would send Facebook PageView and SubscribedButtonClick events disclosing the users' activities.

118.    For instance, when a user searched the website for "arthritis," CCOC would send a PageView event disclosing the user's search for "s=arthritis":



119.    In addition to users' search terms, CCOC also disclosed users' interactions with their search results. For example, when the user clicked to learn more about foot and ankle care displayed from their search for arthritis, CCOC would send a PageView event revealing that the user searched for "s=arthritis" and then loaded a page for "services/foot-and-ankle":



120.    Next, when the user clicked to call a physician from the page about CCOC's foot and ankle page, CCOC would also disclose that through a SubscribedButtonClick event. The event would reveal that the user clicked to call CCOC's telephone number from the page, "Foot & Ankle Specialists in Ohio." The event also revealed the phone number the user clicked to dial:



## CCOC Disclosed Users' Location and Physician Searches

121.    CCOC also disclosed users' searches for a location or physician. Upon a user's navigation to CCOC's locations page,[112] CCOC sent a PageView event revealing that activity:



122.    CCOC would then continue to disclose users' activities as they navigated to pages about specific CCOC's locations. For example, when the user opened the page about CCOC's Kent location, CCOC would transmit a PageView event revealing the user was on a page for "locations/kent":



---

[112] https://www.crystalclinic.com/locations (last acc. Apr. 16, 2024)

34

123.    From CCOC's locations pages, users could click to get directions or to call CCOC. CCOC disclosed these types of activities to Facebook as well.

124.    For instance, when the user clicked to get directions to CCOC's Kent location, CCOC would send a SubscribedButtonClick event informing Facebook that the user clicked to get "DIRECTIONS TO THIS LOCATION," on the "Orthopedic Surgeons &Urgent Care in Kent, Ohio" page:



125.    Similarly, when the user clicked to call CCOC's Kent location, CCOC would send a SubscribedButtonClick event informing Facebook that the user clicked to dial "tel:330-673-6299" from the page about CCOC's Kent, Ohio clinic.

126.    Further, CCOC would also disclose users' physician search activities.

127.    As a user loaded the Physicians page, CCOC sent a PageView event divulging that the user was on the page, "https://www.crystalclinic.com/physicians."

Tavia Galonski, Summit County Clerk of Courts



128.   Then, when the user clicked to use CCOC's physician search, CCOC would send a

SubscribedButtonClick event disclosing that the user clicked to "SEARCH" on CCOC's website:



129.    As the user's search results page loaded, CCOC would then send a PageView event

informing Facebook that the user conducted a search for CCOC physicians:



130.    Just like how CCOC divulged users' interactions with their locations search results,

CCOC would also reveal information about how users interacted with their physician search

results.  For example, when the user clicked to view Dr. James P Kennedy's page from their search

results, CCOC would send a PageView event informing Facebook that the user was viewing the

profile page about "physicians/detail/kennedy-james-p," after conducting a physician search:



131.    CCOC would also disclose when users interacted with a physician's profile.

132.    When the user clicked to (i) learn more about Dr. Kennedy, (ii) review his credentials, (iii) review his patient ratings, or (iv) make an appointment with Dr. Kennedy, CCOC would transmit a SubscribedButtonClick event for each of these activities, as shown by the screenshots below:









133.    The SubscribedButtonClick events would reveal that the user first conducted a search for a foot and ankle specialist and then clicked a button to, respectively, (i) learn more "ABOUT," (ii) review the "CREDENTIALS" for, (iii) browse the "PATIENT RATINGS" for, and (iv) "MAKE APPOINTMENT" for Dr. Kennedy.

**CCOC Disclosed Users' Appointment Request Activities**

134.    Not only does CCOC reveal when users clicked to make appointments from a physician's page, as described above, but CCOC also disclosed users' appointment activities when they used CCOC's Appointments page.

135.    As an illustration, if a user requested to book an appointment with Dr. Kennedy from the Appointments page, CCOC would send a PageView event revealing that the user was on the page, "appointment?doctorRequested=James+P.+Kennedy%2c+M.D":



136. Next, as the user loaded the appointment request confirmation page, CCOC sent another PageView event confirming that the user requested an appointment with Dr. Kennedy and was on the page for "appointment/thank-you?doctorRequested= James+P.+Kennedy%2c+M.D."



**CCOC Disclosed Users' Activities Revealing Users' Patient Statuses**

137.    Finally, CCOC also disclosed users' activities that would reveal their patient status.

138.    For instance, CCOC revealed when users accessed the page to access the portal login page and learn more about the portal ("**Pre-Patient Portal**"). Upon a user's navigation to the Pre-Patient Portal, CCOC would transmit a PageView event informing Facebook that the user was on the page for "patient-information/patient-portal":



139.    Then when the user clicked to request assistance with the patient portal, CCOC would send a SubscribedButtonClick event.



42

140.    The event would disclose to Facebook that the user was on the page, "Patient Portal Information | Crystal Clinic Orthopedic Center," when they clicked to email "PortalHelp@crystalclinic.com" for assistance.

141.    CCOC also revealed when users navigated to the page about CCOC's urgent care service, QuickCare. As a user loaded the QuickCare page, CCOC would send a PageView event revealing the user was on the page, "https://www.crystalclinic.com/quickcare.":



142.    As the user clicked to call CCOC about QuickCare, CCOC would send a SubscribedButtonClick event, which disclosed that the user called CCOC while on the page for "Quick Care Clinic – Orthopedic Urgent Care in Ohio | Crystal Clinic Orthopaedic Center":



143.    Moreover, CCOC disclosed when a user accessed the Release of Medical Information form via a PageView event:



144.    Lastly, CCOC revealed when users accessed its page about paying their CCOC medical bills. When a user loaded CCOC's Bill Pay page, CCOC would send a PageView event informing Facebook that the user was viewing a page about "billing-info/online-bill-pay":



145.    Then, when the user clicked to pay their bill online, CCOC revealed that the user was on the page for "Online Bill Pay – Crystal Clinic Orthopaedic Center," and that they clicked to "PAY NOW."

44



## CCOC Discloses Users' Identifying Information

146.    Finally, via the Meta Pixel, Defendant disclosed users' identifying information, including IP addresses.

147.    In addition, in each of the Facebook events that CCOC sent to Facebook, CCOC included the "c_user" cookie, which Facebook uses to identify users:



45







148.    Facebook can therefore connect cookie data CCOC transmitted with specific users, Plaintiff and the Class Members.

149.    Furthermore, Facebook's "Your activity off Meta technologies" report confirms that Facebook would have received the data CCOC shared with Facebook:



150.     After receiving this information from Defendant, Facebook processes it, analyzes it, and assimilates it into its own massive datasets, before selling access to this data in the form of targeted advertisements. Employing "Audiences"—subsections of individuals identified as sharing common traits—Facebook promises the ability to "find the people most likely to respond to your ad."[113] Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;[114] "Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product bought a product;[115] and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.[116]

151.     Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted advertising.

152.     Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to third parties, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiff's and Class Members' Private Information.

153.     Along those same lines, Defendant could have chosen not to use other tracking technologies such as Google DoubleClick Ads, Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe

---

[113] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[114] *Id.*
[115] *Id.*
[116] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

*Tavia Galonski, Summit County Clerk of Courts*

Audience Manage, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, OpenX, and potentially others to track Plaintiff and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiff's and Class Members' privacy.

154.   On information and belief, Defendant used and disclosed Plaintiff's and Class Members' Private Information to Facebook, and to Google, Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, OpenX, and possibly other third parties, for the purpose of marketing its services and increasing its profits.

155.   On information and belief, Defendant shared, traded, or sold Plaintiff's and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

156.   Plaintiff and the Class Members never consented, agreed, authorized, or otherwise permitted Defendant CCOC to intercept their communications or to use or disclose their Private Information for marketing purposes. Plaintiff and the Class were never provided with any written notice that Defendant disclosed its patients' Protected Health Information to Facebook and others, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's Protected Health Information to unauthorized entities.

157.   Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

Tavia Galonski, Summit County Clerk of Courts

158.    Furthermore, Defendant actively misrepresented that it would preserve the security and privacy of Plaintiff's and Class Members' Private Information. In actuality, Defendant shared data about Plaintiff's and Class Members' activities on the Online Platforms alongside identifying details about the Plaintiff and Class Members, such as their IP addresses.

159.    By law, Plaintiff and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. CCOC deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and possibly others; and  (3) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

**B. Plaintiff's Experience**

160.    Plaintiff has been a patient of Defendant since October 2022, approximately, receiving healthcare services from CCOC and physicians in CCOC's network, including for  knee issues at Crystal Clinic in Canton, Ohio.

161.    Plaintiff relied on CCOC's Website and Online Platforms to communicate confidential patient information, beginning in October 2022, and last in January 2024. Specifically, she used the Online Platforms to: learn about CCOC on its main website page,[117] search for health information,[118] search for physicians, and schedule appointments with them,[119] find locations,[120]

---

[117] https://www.crystalclinic.com/ (last accessed Apr. 15, 2024).
[118] E.g., search for "pain," avail. at https://www.crystalclinic.com/?s=pain (last acc. Apr. 15, 2024).
[119] https://www.crystalclinic.com/physicians (last acc. Apr. 15, 2024).
[120] https://www.crystalclinic.com/locations (last acc. Apr. 15, 2024).

*Tavia Galonski, Summit County Clerk of Courts*

and to find orthopedic treatment services.[121]

162.    Plaintiff accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement and in relation to her past, present, and future health and healthcare.

163.    Plaintiff reasonably expected that her communications with CCOC were confidential, solely between herself and CCOC, and that, as such, those communications would not be transmitted to or intercepted by a third party.

164.    Plaintiff provided her Private Information to Defendant and trusted that the information would be safeguarded according to CCOC's Privacy Policies and the law.

165.    On information and belief, through its use of the Meta Pixel on the Online Platforms, Defendant disclosed to Facebook:

   a.    Plaintiff's identity via her IP addresses and/or "c_user" cookie;

   b.    Plaintiff's seeking of medical treatment;

   c.    Plaintiff's status as a patient;

   d.    The pages and content Plaintiff viewed;

   e.    Plaintiff's search terms, and interactions with results, including treatment services she viewed;

   f.    Plaintiff's location and physician searches, and activities on those pages; and,

   g.    Plaintiff's appointment request information.

166.    By failing to receive the requisite consent, CCOC breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

167.    Plaintiff first discovered that Defendant was using the Meta Pixel and other tracking

---

[121] E.g., "Hand and wrist care," avail. at https://www.crystalclinic.com/services/hand-and-wrist (last acc. Apr. 15, 2024).

*Tavia Galonski, Summit County Clerk of Courts*

technologies to gather and disclose her Private Information in January of 2024.

168.    As a result of CCOC's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff now receives targeted health-related advertisements on Facebook for knee medications and evaluations, and for Defendant itself, reflecting her private medical treatment information.

169.    Plaintiff paid CCOC for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosure.

170.    Because of Defendant's unauthorized Disclosure of her Private Information, Plaintiff has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of this Private Information; unauthorized access to her Private Information by third parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of her Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of her information.

**C. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

171.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[122] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

---

[122] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

172.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]she information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[123]

173.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[124] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[125]

---

[123] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[124] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.)
https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[125] Id.

53

174.     More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[126]

175.     Furthermore, in June 2022, an investigation by The Markup[127] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[128] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[129] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[130]

176.     During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only

---

[126] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[127] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. See www.themarkup.org/about (last accessed Mar. 19, 2023).

[128] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[129] Id.

[130] Id.

Tavia Galonski, Summit County Clerk of Courts

included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[131]

177.    In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[132]

178.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated she was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[133]

### D. Defendant Violated HIPAA Standards

179.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[134]

180.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

181.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care

---

[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

*Tavia Galonski, Summit County Clerk of Courts*

provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[135]

182.    In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of her or his protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[136]

183.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[137]

184.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[138]

185.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with

---

[135] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[136] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[137] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

[138] *Id.*

such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [139]

186. In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

### E. Defendant Violated FTC Standards, and the FTC and HHS Take Action

187. The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[140]

188. On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online

---

[139] *Id.* (emphasis in original) (internal citations omitted).
[140] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **Exhibit A.**

activities."[141]

189.     Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[142] and that "[t]her is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[143]

190.     Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[144]

191.     Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health]

---

[141] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.
[142] *Id.*
[143] *Id.*
[144] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[145]

192.    As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

### F. Defendant Violated Industry Standards

193.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

194.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to CCOC and its physicians.

195.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

196.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized

---

[145] *See, e.g., U.S. v. Easy Healthcare Corp.,* Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.,* FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.,* Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.,* FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

*Tavia Galonski, Summit County Clerk of Courts*

surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

197.   AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## G. Plaintiff's and Class Members' Expectation of Privacy

198.   At all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

## H. IP Addresses are Personally Identifiable Information

199.   Defendant also disclosed and otherwise assisted Facebook and potentially others with intercepting Plaintiff's and Class Members' IP addresses using the Meta Pixel and other tracking technologies.

200.   An IP address is a number that identifies the address of a device connected to the Internet.

201.   IP addresses are used to identify and route communications on the Internet.

202.   IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

203.   Facebook tracks every IP address ever associated with a Facebook user.

204.   Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

205.   Under HIPAA, an IP address is Personally Identifiable Information:

60

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

206.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**I.    Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures**

207.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was marketing and profits.

208.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

209.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

210.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**J.    Plaintiff's and Class Members' Private Information Had Financial Value**

211.    The data concerning Plaintiff and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers

61

to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[146] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[147] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[148]

212.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[149]

213.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

214.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How

---

[146] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).

[147] Id.

[148] See How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

[149] See Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited Aug. 14, 2023).

Tavia Galonski, Summit County Clerk of Courts

Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[150]

215.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[151]

## TOLLING, CONCEALMENT, AND ESTOPPEL

216.    The applicable statutes of limitation have been tolled as a result of CCOC's knowing and active concealment and denial of the facts alleged herein.

217.    CCOC seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. CCOC knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, Audiencerate, Neustar Marketing, dstillery, Media6Degrees, Frequence, Kyruus, ReachLocal/LocaliQ, Federated Media, Amobee, Adobe Audience Manage, Adnxs/AppNexus, The Trade Desk, LiveRamp - Arbor.io (Pippio), LinkedIn, Oracle BlueKai, Simpli.fi, OpenX, and potentially others third parties.

218.    Plaintiff and Class Members could not with due diligence have discovered the full scope of CCOC's conduct, because there were no disclosures or other indication that they were

---

[150] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[151] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

*Tavia Galonski, Summit County Clerk of Courts*

interacting with websites employing Meta Pixel or any other tracking technology to disclose their Private Information, including PHI.

219.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. CCOC's illegal interception and disclosure of Plaintiff's and the Class's Private Information has continued unabated. What is more, CCOC was under a duty to disclose the nature and significance of its data collection practices but did not do so. CCOC is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

220.    Plaintiff brings this statewide class action individually, and on behalf of all other similarly situated persons.

221.    The statewide Class that Plaintiff seeks to represent is defined as follows:

**All Ohio citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

222.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

223.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

224.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is

impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant, and the Class is identifiable within Defendant's records.

225.  Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.  whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

b.  whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

c.  whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

d.  whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

e.  whether Defendant failed to adequately Plaintiff's and Class Members' Private Information;

f.  whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.  whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.  whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

65

i.      whether Defendant breached confidence and unauthorizedly disclosed non-public medical information;

j.      whether Defendant breached its common law duty of care and was negligence;

k.      whether Defendant's conduct amounts to negligence *per se*;

l.      whether Defendant committed invasion of privacy—intrusion upon seclusion;

m.      whether an implied contract existed between Plaintiff and the Class and Defendant;

n.      whether Defendant breached its implied contracts with Plaintiff and the Class Members;

o.      in the alternate, whether Defendant was unjustly enriched;

p.      whether Defendant's conduct constitutes Interception and Disclosure of Electronic Communications in Violation of R.C. § 2933.52.

q.      whether Plaintiff and the Class Members are entitled to monetary damages, including compensatory and statutory damages, and the sums thereof.

226.    Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

227.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect

to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

228.    <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

229.    <u>Superiority and Manageability</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

230.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would

be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

231.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

232.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

233.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Member, and Defendant may continue to act unlawfully as set forth in this Complaint.

234.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

235.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to

the following:

    a.   whether Defendant owed a legal duty to Plaintiff and the Class Members to not disclose their nonpublic medical information, Private Information, to third parties without Plaintiff's or the Class Members' informed consent or other legal privilege;

    b.   whether Defendant disclosed Plaintiff's and the Class Members' nonpublic medical information, Private Information, to third parties without their informed consent or applicable legal privilege;

    c.   whether Defendant intentionally and/or negligently or recklessly breached its duty of confidence to Plaintiff and Class Members by disclosing their nonpublic medical information, Private Information, to third parties;

    d.   whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    e.   whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    f.   whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

    g.   whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

    h.   whether Defendant breached the implied contract;

    i.   whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been used and disclosed to third parties;

    j.   whether Defendant failed to implement and maintain reasonable security procedures and practices;

Tavia Galonski, Summit County Clerk of Courts

k.  whether Defendant committed an invasion of privacy;

l.  whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information; and

m.  whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

### COUNT I
### BREACH OF CONFIDENCE,
### UNAUTHORIZED DISCLOSURE OF NONPUBLIC MEDICAL INFORMATION,
### *BIDDLE V. WARREN GENERAL HOSPITAL*
### (On Behalf of Plaintiff and the Class)

236.  Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

237.  In Ohio, medical providers have a duty to their patients to keep any nonpublic medical information learned within the physician-patient relationship confidential, and to not disclose this information to third parties without a patient's informed consent or other applicable legal privilege entitling the provider to do so.

238.  Defendant had the duty to its patients, Plaintiff and the Class Members, to keep confidential their Private Information, including PHI, and their communications which were transmitted via the Website and Online Platforms, and to not disclose this nonpublic medical information to third parties uninvolved in their treatment without their authorization or applicable legal privilege.

239.  In light of this well-known duty of confidentiality owed by medical providers, Plaintiff and the Class Members had reasonable expectations of privacy in their Private Information and communications when interacting with Defendant through the Online Platforms.

240.  Defendant intentionally and/or negligently, or recklessly, breached its duty of

70

confidentiality to Plaintiff and the Class Members by disclosing their Private Information and confidential communications to third parties, including Facebook, via the Meta Pixel and related tracking technologies, without Plaintiff's or the Class Members' consent.

241.    As a direct and proximate result of Defendant's breaches of confidence in unauthorizedly disclosing Plaintiff's and the Class Members' patient Private Information to third parties, Plaintiff and the Class Members suffered injury and damages, including, without limitation, unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; monetary damages; inappropriate advertisements and use of their Private Information for advertising purposes; increased risk of future harm; embarrassment, humiliation, frustration, and emotional distress; lost value of their Private Information; lost benefit of their bargain; and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's breaches of confidence.

**COUNT II**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

242.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

243.    Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

244.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

*Tavia Galonski, Summit County Clerk of Courts*

245.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

246.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

247.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

248.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

249.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to

72

mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

250.     In failing to secure Plaintiff's and Class Members' Private Information, PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself, and the Class.

**COUNT III**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

251.     Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

252.     Plaintiff alleges this negligence *per se* theory as alternative to her other negligence claim.

253.     Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Private Information.

254.     Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

255.     Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

73

256.    Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

257.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-party such as Facebook gaining access to Plaintiff's and Class Members' PII and PHI, resulting in Defendant's liability under principles of negligence *per se.*

258.    Defendant violated its duty under HIPAA and attendant regulations and Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

259.    Plaintiff's and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

260.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

261.    In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or

*Tavia Galonski, Summit County Clerk of Courts*

conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself, and the Class.

262.     Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

## COUNT IV
## INVASION OF PRIVACY—INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

263.     Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

264.     Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms and the communications platforms and services therein.

265.     Plaintiff and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

266.     Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion and their private affairs and concerns.

267.     Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations and Privacy Policies. Moreover, Plaintiff and Class Members have a

*Tavia Galonski, Summit County Clerk of Courts*

general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

268.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

269.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

270.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

271.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT V
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

272.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

273.    As a condition of receiving medical care from Defendant, Plaintiff and the Class provided their Private Information and paid compensation for the treatment received, a portion of which was for data security.

274.    In so doing, Plaintiff and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policies and elsewhere, to "maintain the privacy of [its] patients' personal, protected health information and to […] notify [patients] if there is a breach of [their] unsecured protected health information;" to not

use or disclose PHI for marketing purposes without written authorization;[152] to "not share any personally identifiable information of any individual with any third party unrelated to Crystal Clinic Orthopaedic Center, except in situations where we must provide information for legal purposes or investigations, or if so directed by the patient through a proper authorization;"[153] and that Defendant "..elected not to use [Marketing] Cookies to share any information with third party advertising or marketing partners to enable them to market to you [] [n]or [...] permit any marketing partners to capture information that could be used to match and identify."[154]

275.    Implicit in the agreement between CCOC and its patients, Plaintiff and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

276.    CCOC had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from CCOC.

277.    CCOC had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

278.    Additionally, CCOC implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

279.    Plaintiff and Class Members fully performed their obligations under the implied contract with CCOC. Defendant did not. Plaintiff and Class Members would not have provided their confidential Private Information to CCOC in the absence of their implied contracts with CCOC and would have instead retained the opportunity to control their Private Information for

---

[152] *Notice of Privacy Practices,* Exhibit B. (bold emphasis removed).
[153] *Privacy Policy,* Exhibit D.
[154] *Cookie Notice,* Exhibit E (bold emphasis removed).

uses other than receiving medical treatment from CCOC.

280.    CCOC breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to an unauthorized third party.

281.    CCOC's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

282.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities, and lost benefit of the bargain.

283.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

### COUNT VI
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

284.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

285.    This claim is pleaded solely in the alternative to Plaintiff's breach of implied contract claim.

286.    Plaintiff and Class Members conferred a monetary benefit upon CCOC in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

287.    Plaintiff and Class Members would not have used CCOC's services or would have

*Tavia Galonski, Summit County Clerk of Courts*

paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

288.    CCOC appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

289.    As a result of CCOC's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

290.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

291.    CCOC should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the unauthorized Disclosure alleged herein.

**<u>COUNT VII</u>**
**INTERCEPTION AND DISCLOSURE OF ELECTRONIC COMMUNICATIONS**
**IN VIOLATION OF R.C. § 2933.52**
**(on behalf of Plaintiff and the Class)**

292.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

293.    Under R.C. § 2933.65(A):

A person whose wire, oral, or electronic communications are intercepted, disclosed, or intentionally used in violation of sections 2933.51 to 2933.66 of the Revised Code may bring a civil action to recover from the person or entity that engaged in

79

the violation any relief that may be appropriate and that includes, but is not limited to, the following:

(1) The preliminary and other equitable or declaratory relief that is appropriate;

(2) Whichever of the following is greater:

    (a) Liquidated damages computed at a rate of two hundred dollars per day for each day of violation or liquidated damages of ten thousand dollars, whichever is greater;

    (b) The sum of actual damages suffered by the plaintiff and the profits, if any, made as a result of the violation by the person or entity that engaged in the violation.

(3) Punitive damages, if appropriate;

(4) Reasonable attorney's fees and other litigation expenses that are reasonably incurred in bringing the civil action.

294.    Plaintiff and Class Members are individuals, and Defendant is a limited liability company, and all parties to this action are "persons" within the meaning of R.C. § 2933.52(A), as defined by R.C. § 2933.51(K) and R.C. § 1.59(C).

295.    It is a violation of R.C. § 2933.52(A)(1) for a person to "[i]ntercept, attempt to intercept, or procure another person to intercept or attempt to intercept a wire, oral, or electronic communication."

296.    It is a violation of R.C. § 2933.52(A)(3) to "[u]se, or attempt to use, the contents of a wire, oral, or electronic communication, knowing or having reason to know that the contents were obtained through the interception of a wire, oral, or electronic communication in violation of sections 2933.51 to 2933.66 of the Revised Code."

297.    The exceptions set forth in R.C. § 2933.52(B)(4) are not applicable to Defendant's Disclosure complained of herein, even though Defendant was party to the communications, as Plaintiff and the Class Members did not give their consent, and because the interceptions were for the purpose of committing tortious act in violation of the laws of Ohio and for the purpose of committing other injurious acts.

80

298.    Plaintiff's and Class Members' activities on the Website and Online Platforms are electronic communications within the meaning of R.C. § 2933.52, defined in R.C. § 2933.51(N) as "a transfer of a sign, signal, writing, image, sound, datum, or intelligence of any nature that is transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system."

299.    The devices used in this case, include, but are not limited to

a.    those to which Plaintiff's and Class Members' communications were disclosed;

b.    Plaintiff's and Class Members' personal computing devices;

c.    Plaintiff's and Class Members' web browsers;

d.    Plaintiff's and Class Members' browser-managed files;

e.    the Meta Pixel;

f.    internet cookies;

g.    other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server;

h.    Defendant's computer servers;

i.    third-party source code utilized by Defendant; and

j.    computer servers of third parties (including Facebook).

300.    These constitute interception devices within the meaning of R.C. 2933.52, defined in R.C. 2933.51(D) as "an electronic, mechanical, or other device or apparatus that can be used to intercept a wire, oral, or electronic communication".

301.    Given that Defendant acquired the contents of Plaintiff's and Class Members' communications on the Website for tortious and other injurious purposes, their acts in so acquiring

Tavia Galonski, Summit County Clerk of Courts

those communications constitute interception within the meaning of R.C. § 2933.52, defined in R.C. § 2933.51(C) as "the … acquisition of the contents of any … electronic communication through the use of an interception device."

302.    Given that Defendant acquired the contents of Plaintiff's and Class Members' communications on the Website for tortious and otherwise injurious purposes, and knew that Facebook would also use them for tortious and otherwise injurious purposes, Defendant's actions in transmitting those communications to Facebook by installing the Meta Pixel on its Website and Online Platforms constitutes procuring another person to intercept electronic communications, in violation of R.C.2933.52(A)(3).

303.    As a result of Defendant's knowing and intentional interceptions of their electronic communications, Plaintiff and Class Members are entitled to preliminary and permanent injunctive relief, declaratory judgment, liquidated damages or actual damages in amounts to be proved under R.C. § 2933.65(A)(2) but not less than $10,000.00 each, punitive damages, and their reasonable attorney's fees and expenses.

304.    In addition to statutory damages, Defendant's violations caused Plaintiff and Class Members the following damages.

      a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

      b.    Defendant eroded the essential confidential nature of the doctor-patient relationship.

      c.    Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such

82

value;

    d.      Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

    e.      Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

305.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.      for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.      for an award of actual damages, compensatory damages, statutory damages including treble damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.      for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

D.      for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and

83

unlawfully disclosed to third parties;

E.    for equitable relief requiring restitution and disgorgement of the revenues

wrongfully retained as a result of Defendant's wrongful conduct;

F.    an order Defendant to pay for not less than three years of credit monitoring

services for Plaintiff and the Class;

G.    an Order requiring Defendant to pay for not less than three years of credit

monitoring services for Plaintiff and the Class;

H.    for an award of attorneys' fees under OCSPA, the common fund doctrine, and any

other applicable law;

I.    costs and any other expenses, including expert witness fees incurred by Plaintiff

in connection with this action;

J.    pre- and post-judgment interest on any amounts awarded; and

K.    such other and further relief as this court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all matters so triable.

Dated: April 22, 2024                    Respectfully submitted,

                                         Caleb Harbison (103883)
                                         J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
                                         Andrew E. Mize (*Pro Hac Vice* forthcoming)
                                         STRANCH, JENNINGS & GARVEY, PLLC
                                         The Freedom Center
                                         223 Rosa L. Parks Avenue, Suite 200
                                         Nashville, Tennessee 37203
                                         (615) 254-8801
                                         (615) 255-5419 (facsimile)
                                         charbison@stranchlaw.com
                                         gstranch@stranchlaw.com
                                         amize@stranchlaw.com

*Tavia Galonski, Summit County Clerk of Courts*

Lynn A. Toops (*Pro Hac Vice* forthcoming)
Mary Kate Dugan (*Pro Hac Vice* forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

***Counsel for Plaintiff and the Proposed Class***

*Tavia Galonski, Summit County Clerk of Courts*

## EXHIBIT A





July 20, 2023

[Company]
[Address]
[City, State, Zip Code]
Attn: [Name of Recipient]

  Re: Use of Online Tracking Technologies

Dear [Name of Recipient],

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities.  These tracking technologies

---

[1] *See, e.g.,* Mingjia Huo, Maxwell Bland, and Kirill Levchenko, *All Eyes on Me:  Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, Proceedings of the 21st Workshop on Privacy in the Electronic Society (Nov. 7, 2022), https://dl.acm.org/doi/10.1145/3559613.3563190.

[2] *See, e.g.,* Todd Feathers, Katie Palmer, and Simon Fondrie-Teitler, *Out of Control: Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[3] *U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/cases-proceedings/192-3133-flo-health-inc.

[4] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users.

Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.

### Health Insurance Portability and Accountability Act of 1996 (HIPAA)

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium.

The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (*e.g.,* tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules. OCR's December 2022 bulletin about the use of online tracking technologies by HIPAA regulated entities provides a general overview of how the HIPAA Rules apply.[5] This bulletin discusses what tracking technologies are and reminds regulated entities of their obligations to comply with the HIPAA Rules when using tracking technologies.

### FTC Act and FTC Health Breach Notification Rule

Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. This is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes. As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app.[6] The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[7] Within the last

---

[5] *Id.*

[6] *See supra* note 3.

[7] *See* Federal Trade Comm'n, *Statement of the Commission on Breaches by Health Apps and Other Connected Devices* (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

2

few months, the FTC has issued a series of guidance pieces addressed to entities collecting, using, or disclosing sensitive health information.[8]

OCR and the FTC remain committed to ensuring that consumers' health privacy remains protected with respect to this critical issue. Both agencies are closely watching developments in this area. To the extent you are using the tracking technologies described in this letter on your website or app, we strongly encourage you to review the laws cited in this letter and take actions to protect the privacy and security of individuals' health information.[9]

Sincerely,

     /s/

Melanie Fontes Rainer
Director
Office for Civil Rights
U.S. Department of Health and Human Services

     /s/

Samuel Levine
Director
Bureau of Consumer Protection
Federal Trade Commission

---

[8] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking; Lesley Fair, *First FTC Health Breach Notification Rule case addresses GoodRx's not-so-good privacy practices* (Feb. 1, 2023), https://www.ftc.gov/business-guidance/blog/2023/02/first-ftc-health-breach-notification-rule-case-addresses-goodrxs-not-so-good-privacy-practices; Federal Trade Comm'n and the U.S. Department of Health & Human Services' Office of the National Coordinator for Health Information Technology (ONC), Office for Civil Rights (OCR), and Food and Drug Administration (FDA), *Mobile Health App Interactive Tool* (Dec. 2022), https://www.ftc.gov/business-guidance/resources/mobile-health-apps-interactive-tool; Kristin Cohen, *Location, health, and other sensitive information: FTC Committed to fully enforcing the law against illegal use and sharing of highly sensitive data* (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.

[9] In addition to the HIPAA Rules, the FTC Act, and the FTC Health Breach Notification Rule, you may also be subject to other state or federal statutes that prohibit the disclosure of personal health information.

3

Case: 5:24-cv-00907-CEF  Doc #: 1-3  Filed:  05/22/24  89 of 104.  PageID #: 110



[Home](Home) / HIPAA Notice of Privacy Practices

## NOTICE OF PRIVACY PRACTICES

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION.**

**PLEASE REVIEW IT CAREFULLY.**

The terms of this Notice of Privacy Practices apply to Crystal Clinic Orthopaedic Center, Crystal Clinic Inc., any entities or facilities owned by or affiliated with Crystal Clinic Orthopaedic Center and the Medical Staff and their dependent practitioners (collectively referred to as "Crystal Clinic Orthopaedic Center"). These entities and people operate together as a clinically integrated health care arrangement. This clinically integrated health care arrangement includes our main facility and remote offices and clinics, and all of our programs, services, departments and units within our health care facilities. Crystal Clinic Orthopaedic Center is made up of many people such as our doctors, physician assistants, nurses, therapists, specialists, other health care professionals permitted by us to provide services to you, and staff, students, residents, trainees, volunteers and others involved in providing your care and services. These entities and people will share personal, protected health information of patients as necessary to carry out treatment, payments and health care operations as permitted by law.

Crystal Clinic Orthopaedic Center is required by law to maintain the privacy of our patients' personal, protected health information and to provide patients with notice of our legal duties and privacy practices with respect to your personal, protected health information. We are required to notify you if there is a breach of your unsecured protected health information. We are required to abide by the terms of this Notice so long as it remains in effect. We reserve the right to change the terms of this Notice of Privacy Practices as necessary and to make the new Notice effective for all personal, protected health information maintained by us. You may receive a copy of any revised Notice at any Crystal Clinic Orthopaedic Center point of registration or a copy may be obtained by mailing a request to the Privacy Officer of Crystal Clinic Orthopaedic Center at 3925 Embassy Parkway, Suite 250, Akron, OH 44333.USES AND DISCLOSURES OF YOUR PERSONAL PROTECTED HEALTH INFORMATION

Tavia Galonski, Summit County Clerk of Courts

Your Authorization. Except as outlined below, we will not use or disclose your personal, protected health information for any purpose unless you have signed a form authorizing the use or disclosure. Most uses and disclosures of your health information for marketing purposes and disclosures that constitute a sale of your health information require your authorization. You have the right to revoke that authorization in writing unless we have taken any action in reliance on thatthe authorization.

Your Authorization. Except as outlined below, we will not use or disclose your personal, protected health information for any purpose unless you have signed a form authorizing the use or disclosure. Most uses and disclosures of your health information for marketing purposes and disclosures that constitute a sale of your health information require your authorization. You have the right to revoke that authorization in writing unless we have taken any action in reliance on the authorization.

Uses and Disclosures for Treatment. We will make uses and disclosures of your personal, protected health information as necessary for your treatment. For instance, doctors, nurses and other professionals involved in your care will use information in your medical record and information that you provide about your symptoms and reactions to plan a course of treatment for you that may include procedures, medications, tests, etc. We may also release your personal, protected health information to another health care facility or professional who is not affiliated with our organization but who is or will be providing treatment to you. For instance, if, after you leave the surgery center, you are going to receive home health care, we may release your personal, protected health information to that home health care agency so that a plan of care can be prepared for you. We may also participate in electronic health information exchanges that facilitate access to personal, protected health information by other health care providers who provide you care. For example, if you receive care from another provider that participates in the health information exchange, this exchange will allow us to make your personal protected health information available to the provider as needed for your treatment.

Uses and Disclosures for Payment. We will make uses and disclosures of your personal, protected health information as necessary for the payment purposes of those health professionals and facilities that have treated you or provided services to you. For instance, we may forward information regarding your medical procedures and treatment to your insurance company to arrange payment for the services provided to you or we may use your information to prepare a bill to send to you or to the person responsible for your payment.

Uses and Disclosures for Health Care Operations. We will use and disclose your personal protected health information as necessary and as permitted by law, for our health care operations that include clinical improvement, professional peer review, business management, accreditation and licensing, etc. For instance, we may use and disclose your personal, protected health information for purposes of improving the clinical treatment and care of our patients. We may disclose protected health information to doctors, nurses, technicians, medical students, volunteers and other persons for review and learning purposes and for the operation of educational programs. We may also disclose your personal, protected health information to another health care facility, health care professional, or health plan for such things as quality assurance and case management, but only if that facility, professional, or plan also has or had a patient relationship with you.

Our Patient Directory. Crystal Clinic Orthopaedic Center maintains a patient directory listing the name, room number, general condition and, if you wish, your religious affiliation. Unless you choose to have your

CV-2024-04-1722
MICHAEL, KATHRYN
04/22/2024 14:41:41 PM
CMPO
Page 91 of 104
HIPAA Notice of Privacy Practices - Crystal Clinic Orthopaedic Center

Case: 5:24-cv-00907-CEF Doc #: 1-3 Filed: 05/17/24 91 of 104. PageID #: 112

personal, protected health information excluded from this directory, the information, excluding your religious affiliation, will be disclosed to anyone who requests it by asking for you by name. This information, including your religious affiliation, may be also provided to members of the clergy. You have the right during registration to have your information excluded from this directory.

Family and Friends Involved in Your Care. With your approval, we may disclose your personal, protected health information to designated family, friends, and others who are involved in your care or in payment of your care in order to facilitate that person's involvement in caring for you or paying for your care. If you are unavailable, incapacitated, or facing an emergency medical situation, and we determine that a limited disclosure may be in your best interest, we may share limited personal, protected health information with such individuals without your approval. We may also disclose limited personal, protected health information to a public or private entity that is authorized to assist in disaster relief efforts in order for that entity to locate a family member or other persons that may be involved in some aspect of caring for you.

Business Associates. Certain aspects and components of our services are performed through contracts with outside persons or organizations such as auditing, accreditation, legal services, etc. At times it may be necessary for us to provide some of your personal, protected health information to one of or more of these outside persons or organizations who assist us with our health care operations. In all cases, we require these business associates to appropriately safeguard the privacy of your information.

Fundraising. We may contact you to donate to a fundraising effort for or on our behalf. You have the right to "opt-out" of receiving fundraising materials or communications and may do so by sending your name and address to the Privacy Officer of Crystal Clinic Orthopaedic Center at 3925 Embassy Parkway, Suite 250, Akron, OH 44333 together with a statement that you do not wish to receive fundraising materials or communications from us.

Appointments and Services. We may contact you to provide appointment reminders or information about treatment alternatives or other health-related benefits and services that may be of interest to you. You have the right to request and we will accommodate reasonable requests by you to receive communications regarding your personal, protected health information from us by alternative means or at alternative locations. For instance, if you wish appointment reminders not to be left on voice mail or sent to a particular address, we will accommodate reasonable requests. You may request such confidential communication in writing and may send your request to the Privacy Officer of Crystal Clinic Orthopaedic Center at 3925 Embassy Parkway, Suite 250, Akron, OH 44333.

Health Products and Services. We may from time to time use your personal, protected health information to communicate with you about health products and services necessary for your treatment, to advise you of new products and services we offer, and to provide general health and wellness information.

Research. In limited circumstances, we may use and disclose your personal, protected health information for research purposes. For example, a researcher may wish to compare outcomes of all patients that received a particular drug and will need to review a series of medical records. In all cases where your specific authorization is not obtained, your privacy will be protected by strict confidentiality requirements applied by an Institutional Review Board that oversees the research, or by representations of the researchers that limit their use and disclosure of patient information.

CV-2024-06-1722                 MICHAEL, KATHRYN         04/22/2024 14:41:41 PM              CMSD                              Page 82 of 104
4/16/24, 12:16 PM                                          HIPAA Notice of Privacy Practices – Crystal Clinic – Akron, OH & Center

Other Uses and Disclosures. We are permitted or required by law to make certain other uses and disclosures of your personal, protected health information without your authorization. We may release your personal, protected health information:

• For any purpose required by law;

• For public health activities, such as required reporting of disease, injury, and birth and death, and for required public health investigations;

• As required by law if we suspect child abuse or neglect; we may also release your personal, protected health information as required by law if we believe you to be a victim of abuse, neglect, or domestic violence;

• To the Food and Drug Administration if necessary to report adverse events, product defects, or to participate in product recalls;

• To your employer when we have provided health care to you at the request of your employer; in most cases you will receive notice that information is disclosed to your employer;

• If required by law to a government oversight agency conducting audits, investigations, or civil or criminal proceedings;

• If required to do so by a court or administrative ordered subpoena or discovery request; in most cases you will have notice of such release;

• To law enforcement officials as required by law to report wounds and injuries and crimes;

• To coroners, medical examiners, and/or funeral directors consistent with the law;

• If necessary to arrange an organ or tissue donation from you or a transplant for you;

• If you are a member of the military as required by armed forces services; we may also release your personal, protected health information if necessary for national security or intelligence activities;

• To workers' compensation agencies if necessary for your workers' compensation benefit determination.RIGHTS THAT YOU HAVE

Access to Your Personal, Protected Health Information. You have the right to receive a copy and/or inspect much of the personal, protected health information that we retain on your behalf. All requests for access must be made in writing and signed by you or your representative. We will charge you a reasonable fee if you request a copy of the information. We may also charge for postage if you request a mailed copy. Patients or their legal representatives may request access to their personal, protected health information by completing the Authorization for Release of Information Form. This Form is available from Health Information Management or the Patient Accounts Department.

Amendments to Your Personal, Protected Health Information. You have the right to request in writing that personal, protected health information that we maintain about you be amended or corrected. We are not obligated to make all requested amendments but will give each request careful consideration. All amendment requests, in order to be considered by us, must be in writing, signed by your or your representative, and must state the reasons for the amendment/correction request. If we make an amendment or correction that you request, we may also notify others who work with us and have copies of the uncorrected record if we believe that such notification is necessary. Amendment request forms may be obtained from Health Information Management.

Case: 5:24-cv-00907-CEF  Doc #: 13  Filed: 05/22/24  93 of 104.  PageID #: 114

Accounting for Disclosures of Your Personal, Protected Health Information. You have the right to receive an accounting of certain disclosures made by us of your personal, protected health information after May 2009. Requests must be made in writing and signed by you or your representative. Accounting request forms are available from Health Information Management.

The first accounting in any 12-month period is free; you will be charged a reasonable fee for each subsequent accounting you request within the same 12-month period.

Restrictions on Use and Disclosure of Your Personal, Protected Health Information. You have the right to request restrictions on certain uses and disclosures of your personal, protected health information for treatment, payment, or health care operations by contacting the Privacy Officer. We are not required to agree to your restriction request but will attempt to accommodate reasonable requests when appropriate. There is one exception: We must agree to your restriction request if you ask us not to disclose information related to a health care item or service to your health plan for the purposes of payment or health care operations when you have paid for the health care item or service out of pocket in full. We retain the right to terminate an agreed-to restriction if we believe such termination is appropriate. In the event of a termination by us, we will notify you of such termination. You also have the right to terminate, in writing or orally, any agreed to restriction by sending such termination notice to the Privacy Officer of Crystal Clinic Orthopaedic Center at 3925 Embassy Parkway, Suite 250, Akron, OH 44333. Any agreed-to restriction will not limit patient directory disclosures unless you exclude yourself from the patient directory.

Complaints. If you believe your privacy rights have been violated, you can file a complaint with the Privacy Officer, Patient Liaison, or the Compliance Hotline. You may also file a complaint with the Secretary of U.S. Department of Health and Human Services in Washington, D.C. in writing within 180 days of a perceived violation of your rights. There will be no retaliation for filing a complaint.FOR FURTHER INFORMATION

If you have questions or need further assistance regarding this Notice, you may contact the Privacy Officer of Crystal Clinic Orthopaedic Center at 3925 Embassy Parkway, Suite 250, Akron, OH 44333, telephone (330) 670-6123. You may also call the Compliance Alert Line of Crystal Clinic Orthopaedic Center at (330) 670-4799.

If you have questions or need further assistance regarding this Notice, you may contact the Privacy Officer of Crystal Clinic Orthopaedic Center at 3925 Embassy Parkway, Suite 250, Akron, OH 44333, telephone (330) 670-6123. You may also call the Compliance Alert Line of Crystal Clinic Orthopaedic Center at (330) 670-4799.

As a patient you retain the right to obtain a paper copy of this Notice of Privacy Practices, even if you have requested such copy by email or other electronic means.EFFECTIVE DATE.
This Notice of Privacy Practices is effective May 2009.
Revised March 26, 2013.



About Us    +

Locations    +

## Services

+

Crystal Clinic is a physician-owned hospital system

© 2024 Crystal Clinic Orthopaedic Center

Terms and Conditions

Privacy

HIPAA Notice of Privacy Practices

Cookies Notice

CV-2024-04-1722                    MICHAEL, KATHRYN            04/22/2024 14:41:42 PM           CMCO
4/18/24, 12:25 PM                                              Terms and Conditions - Crystal Clinic Orthopaedic Center                    EXHIBIT C

Case: 5:24-cv-00907-CEF  Doc #: 1-3  Filed: 05/22/24  95 of 104.  PageID #: 116



[Home](Home) / Terms and Conditions

## Terms and Conditions

Thank you for visiting Crystal Clinic Orthopedic Center's website.

All health information posted on the site has been written or reviewed and approved by Crystal Clinic Orthopedic Center physicians or health professionals unless otherwise specified.

This website is sponsored solely by Crystal Clinic Orthopedic Center. The information provided on [https://www.crystalclinic.com/](https://www.crystalclinic.com/) is designed to support, not replace, and does not by itself create the relationship that exists between a patient/site visitor and his/her physician.

By accessing, browsing and/or using web pages or other digital content in this site, you accept, without limitation or qualification, the following terms of use.

CONSENT. You agree that your use of the Crystal Clinic Orthopedic Center website and any uses of any services or materials are subject to your agreement with all of these Terms of Use and the [Website Privacy Policy](Website Privacy Policy). You agree that you will not violate any local, state, federal or international laws in using this website or accessing any material on this website.

SITE ACCESS. Crystal Clinic Orthopedic Center reserves the right to prohibit, restrict or discontinue your access to certain pages within the website if you violate any terms of this agreement. Crystal Clinic Orthopedic Center may modify these Terms of Use at any time without notice. The modified terms of use will be effective upon posting on our website. To remain in compliance, Crystal Clinic Orthopedic Center suggests that you review the Terms of Use, as well as the [Website Privacy Policy](Website Privacy Policy), at regular intervals.

MEDICAL DISCLAIMER. IF THIS IS A MEDICAL EMERGENCY, PLEASE IMMEDIATELY CALL EMERGENCY PERSONELL (911) TO GET PROMPT MEDICAL ATTENTION. DO NOT RELY ON ELECTRONIC COMMUNICATIONS OR THIS WEBSITE FOR ASSISTANCE IN REGARD TO YOUR IMMEDIATE, URGENT MEDICAL NEEDS. THIS WEBSITE IS NOT DESIGNED TO FACILITATE MEDICAL EMERGENCIES. CRYSTAL CLINIC ORTHOPAEDIC CENTER CANNOT GUARANTEE RESPONSE TIMES IF YOU CHOOSE TO USE THIS WEBSITE IN THE EVENT OF A MEDICAL EMERGENCY.

4/2/2024, 04:13:12 PM     MICHAEL, KATHRYN     04/22/2024 14:41:41 PM     Terms and Conditions - Crystal Clinic Orthopedic Center     Page 96 of 104

SECURITY. All forms that request personal information (name, address, E-mail address, etc.) are secure and provide encrypted transmission over the Internet. Please refer to our Website Privacy Policy for more information concerning encryption technology utilized by Crystal Clinic Orthopedic Center.

DISCLAIMER OF WARRANTY. MATERIALS, SERVICES OR OTHER INFORMATION ARE PROVIDED "AS IS" BY CRYSTAL CLINIC ORTHOPAEDIC CENTER FOR EDUCATIONAL PURPOSES ONLY.

CRYSTAL CLINIC ORTHOPAEDIC CENTER MAKES NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, TITLE OR NON INFRINGEMENT.

ALTHOUGH OUR HEALTH INFORMATION CONTENT IS REVIEWED AND APPROVED BY HEALTHCARE PROFESSIONALS, CRYSTAL CLINIC ORTHOPAEDIC CENTER DOES NOT GUARANTEE THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY INFORMATION AND IS NOT RESPONSIBLE FOR ANY ERRORS OR OMISSIONS OR FOR THE RESULTS OBTAINED FROM THE USE OF SUCH INFORMATION.

YOU ACKNOWLEDGE AND AGREE THAT CRYSTAL CLINIC ORTHOPAEDIC CENTER DOES NOT OPERATE OR CONTROL THE INTERNET, AND THEREFORE CRYSTAL CLINIC ORTHOPAEDIC CENTER DOES NOT GUARANTEE THAT THE USE OF THIS WEBSITE WILL BE ERROR-FREE OR FREE OF TECHNOLOGY DOWNTIMES OR UNAVAILABILITY.

YOU ACKNOWLEDGE AND AGREE THAT CRYSTAL CLINIC ORTHOPAEDIC CENTER CANNOT AND DOES NOT GUARANTEE AGAINST VIRUSES, WORMS OR OTHER UNAUTHORIZED USERS OR HACKERS ATTEMPTING TO OBTAIN ACCESS TO THIS WEBSITE OR INFORMATION TRANSMITTED TO OR FROM THIS SITE.

Crystal Clinic Orthopedic Center also reserves the right to temporarily or permanently discontinue this site, any page or any functionality on this website at any time and without notice.

LIMITATION OF LIABILITY. IN NO EVENT SHALL CRYSTAL CLINIC ORTHOPAEDIC CENTER BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL OR MONETARY DAMAGES, INCLUDING FEES AND PENALTIES IN CONNECTION WITH YOUR USE OF MATERIALS POSTED ON THIS SITE OR CONNECTIVITY TO OR FROM THIS SITE TO ANY OTHER SITE.

GOVERNING LAW. You agree that any claim or dispute relating to the Crystal Clinic Orthopedic Center website or your use or reliance on this website shall be construed in accordance with the laws of the State of Ohio without regard to its conflict of laws provisions. The parties agree to be bound and shall be subject to the exclusive jurisdiction of the local, state or federal courts located in Summit County, Ohio.

USER NAME AND PASSWORD. In the event you access any Service requiring a User Name and Password, you are solely responsible for keeping such User Name and Password strictly confidential.

CHILDREN. Except as otherwise indicated, Crystal Clinic Orthopedic Center does not knowingly or intentionally collect personal information from children under age 18. The content of our website is directed at adults, and therefore this site is intended for use only by adults over the age of 18. If you are under the age of 18, please consult a parent or guardian for help in using this website.

CV-2024-04-1722
MICHAEL, KATHRYN
04/22/2024 14:41:42 PM
CMCO
Page 97 of 104

Terms and Conditions - Crystal Clinic Orthopaedic Center

Case: 5:24-cv-00907-CEF Doc #: 13 Filed: 05/22/24 97 of 104. PageID #: 118

INBOUND LINKS. You may not, under any circumstances, establish a link to the Crystal Clinic Orthopedic Center website without the express written consent of the General Counsel of Crystal Clinic Orthopedic Center, including, but not limited to, deep linking.

EXTERNAL LINKS. Please note that pages of this site may be linked to other sites which may have different terms of use. The Crystal Clinic Orthopedic Center does not own, control, manage, supervise, direct or otherwise have any involvement in the business or affairs of any third party site. Crystal Clinic Orthopedic Center is not responsible for the privacy practices or the content of the third party site. Once you link to another site, you are subject to the privacy policy of that site. Crystal Clinic Orthopedic Center encourages you to be aware when you are leaving the Crystal Clinic Orthopedic Center website to read the privacy statements of each and every website that you visit before providing any personally identifiable information.

INTELLECTUAL PROPERTY. Unless otherwise indicated, all Intellectual Property, including, without limitation, trademarks, service marks, trade dress, logos and all copyrightable works displayed and used in this site, are the property of the Crystal Clinic Orthopedic Center. Nothing in this site should be construed as granting any right or license to use any Intellectual Property without the written permission of the Crystal Clinic Orthopedic Center. You may not, in whole or in part, reprint, retransmit, distribute or reproduce any information on this website unless you receive Crystal Clinic Orthopedic Center's prior written permission.

PRIVACY. Please read the full text of our Notice of Privacy Practices to understand how any Protected Health Information ("PHI"), as that term is defined in the Notice of Privacy Practices (HIPAA), that you submit via the Crystal Clinic Orthopedic Center website will be treated.

**BY USING THIS WEBSITE, YOU ACCEPT THESE TERMS.**

Last updated: 4/22/2011

Copyright © 2011 Crystal Clinic Orthopedic Center. All Rights Reserved.



About Us +

Locations +

Services +

Crystal Clinic is a physician-owned hospital system

© 2024 Crystal Clinic Orthopaedic Center

Terms and Conditions

Privacy

HIPAA Notice of Privacy Practices

Cookies Notice

CV-2024-04-1772
4/16/24, 12:16 PM    MICHAEL, KATHRYN    04/22/2024 14:41:42 PM    CMCO
Privacy - Crystal Clinic Orthopaedic Center    Page 98 of 104    EXHIBIT D



**Home** / Privacy

**Privacy Policy**

At Crystal Clinic Orthopaedic Center, we understand, acknowledge and respect any individual's right to privacy and the concerns one may have in regard to privacy and security. We recognize the importance of protecting the privacy of information provided by our patients, as well as general users of our website.

*IMPORTANT NOTE!* The Crystal Clinic Orthopaedic Center Notice of Privacy Practices is a separate document that governs how medical information about you may be used and disclosed by Crystal Clinic Orthopaedic Center.

**MEDICAL DISCLAIMER. IF THIS IS A MEDICAL EMERGENCY, PLEASE IMMEDIATELY CALL EMERGENCY PERSONNEL (911) TO GET PROMPT MEDICAL ATTENTION. DO NOT RELY ON ELECTRONIC COMMUNICATIONS OR THIS WEBSITE FOR ASSISTANCE IN REGARD TO YOUR IMMEDIATE, URGENT MEDICAL NEEDS. THIS WEBSITE IS NOT DESIGNED TO FACILITATE MEDICAL EMERGENCIES. CRYSTAL CLINIC ORTHOPAEDIC CENTER CANNOT GUARANTEE RESPONSE TIMES IF YOU CHOOSE TO USE THIS WEBSITE IN THE EVENT OF A MEDICAL EMERGENCY.**

**PERSONAL INFORMATION**

**A visitor can access and browse our entire site at any time without providing any personal information. We do not collect information that would personally identify you unless you choose to provide it.**

In addition, Crystal Clinic Orthopaedic Center does not share any personally identifiable information of any individual with any third party unrelated to Crystal Clinic Orthopaedic Center, except in situations where we must provide information for legal purposes or investigations, or if so directed by the patient through a proper authorization.

**Forms**
**Our website contains forms through which users may request information or supply feedback to us. In some cases, telephone numbers, E-mail addresses or return addresses are required so that we can supply requested information to you, and in other cases, correct names and addresses are required to process credit card payments.**

Tavia Galonski, Summit County Clerk of Courts

CV-2024-06-1722
4/30/24, 12:16 PM          MICHAEL, KATHRYN          04/22/2024 14:41:41 PM          CMCO          Page 98 of 104
                                                                                    Privacy - Crystal Clinic Orthopaedic Center

Case: 5:24-cv-00907-CEF Doc #: 1-3 Filed: 05/22/24 99 of 104. PageID #: 120

After you fill out a form, we may contact you with follow-up information. We do not provide any information supplied on our web forms to any outside organization for any reason (other than where we may be required to by law, or as necessary to process credit card information). We do not save this personal information for any other reason.

## Surveys

**Occasionally, we may survey visitors to our site. The information from these surveys is used in aggregate form to help us understand the needs of our visitors, so that we can improve our site. We generally do not ask for information in surveys that would personally identify you. If we do request contact information for follow-up, you may decline to provide it. If survey respondents provide personal information (such as an E-mail address) in a survey, it is shared only with those people who need to see it to respond to the question or request. We do not save this personal information for any other reason.**

## E-mail

**"Phishing" is a scam designed to steal your personal information. If you receive an E-mail that looks like it is from Crystal Clinic Orthopaedic Center asking you for your personal information, do not respond. We will never request your password, user name, credit card information or other personal information through E-mail.**

## User Name and Password

**In the event you access any Service requiring a user name and password, you are solely responsible for keeping such user name and password strictly confidential.**

## NON-PERSONAL INFORMATION

**Crystal Clinic Orthopaedic Center collects non-personal information such as website usage, traffic patterns, site performance and related statistics based on our tracking of your visits to the website.**

## IP Addresses

**The Web server automatically collects the IP (which stands for Internet Protocol) address of the computers that access our site. An IP address is a number that is assigned to your computer when you access the Internet. It is not truly personally identifiable information because many different individuals can access the Internet via the same computer. We use this information in aggregate form to understand how our site is being used and how we can better serve visitors.**

Please note that although such information is not personally identifiable, we can determine from an IP address a visitor's Internet Service Provider and the geographic location of his or her point of connectivity.

## First Party Cookies

**We collect information about visitors to our site using "first party cookies," which are alphanumeric identifiers that we transfer to your computer's hard drive through your web browser. Cookies are never associated with specific personal identities. First party cookies are distinct from third party cookies in that they are created and directly served by the company hosting the website.**

We use two types of "cookies" on this site:

- **We use persistent cookies to recognize a repeat visitor, enabling us the opportunity to offer the visitor a set of services or information requested in a** previous **visit.**
- **We use session cookies to track a visitor's path through our site during a visit to help us understand how people use our site.**

CV-2024-06-1722                    MICHAEL, KATHRYN          04/22/2024 14:41:47 PM                    GMCO                    Page 100 of 104
4/18/24, 12:18 PM                                                                Privacy - Crystal Clinic Orthopaedic Center

You can delete our cookies at any time. The "help" section, located on the toolbar of most browsers, will tell you how to prevent your browser from accepting new cookies, how to have the browser notify you when you receive a new cookie or how to disable cookies altogether. Since cookies allow you to take full advantage of some of our website's best features, we recommend that you leave them turned on.

**SECURITY OF YOUR INFORMATION**

**Please note that our forms are encrypted to protect your privacy. Once the information is sent to our site, it is kept in secure databases where it is not available to users on the internet. While we sometimes ask for credit card numbers or certain service transactions, and either pass them on to a credit card processing service or process them manually, we do not store credit card numbers online.**

Crystal Clinic Orthopaedic Center periodically reviews and modifies, where appropriate, its security policies and procedures. We use reasonable care to protect your personally identifiable and confidential information provided by you to our site. Crystal Clinic Orthopaedic Center has in place a security program that seeks to mitigate this risk substantially.

**DISCLAIMER OF WARRANTY**

**MATERIALS, SERVICES AND OTHER INFORMATION ARE PROVIDED "AS IS" BY CRYSTAL CLINIC ORTHOPAEDIC CENTER FOR EDUCATIONAL PURPOSES ONLY. CRYSTAL CLINIC ORTHOPAEDIC CENTER MAKES NO EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE, TITLE OR NON INFRINGEMENT.**

PLEASE NOTE THAT, BY ITS VERY NATURE, A WEBSITE CANNOT BE ABSOLUTELY PROTECTED AGAINST INTENTIONAL OR MALICIOUS INTRUSION ATTEMPTS. FURTHERMORE, CRYSTAL CLINIC ORTHOPAEDIC CENTER DOES NOT CONTROL THE DEVICES OR COMPUTERS OR THE INTERNET OVER WHICH YOU MAY CHOOSE TO SEND CONFIDENTIAL PERSONAL INFORMATION AND CANNOT, THEREFORE, PREVENT SUCH INTERCEPTIONS OF COMPROMISES TO YOUR INFORMATION WHILE IN TRANSIT TO CRYSTAL CLINIC ORTHOPAEDIC CENTER.

THEREFORE, CRYSTAL CLINIC ORTHOPAEDIC CENTER HEREBY MAKES NO GUARANTEE AS TO SECURITY, INTEGRITY OR CONFIDENTIALITY OF ANY INFORMATION TRANSMITTED TO OR FROM THE WEBSITE, OR STORED WITHIN THIS WEBSITE.

BEYOND OUR REASONABLE CARE TO SAFEGUARD YOUR INFORMATION WHILE IN TRANSIT, CRYSTAL CLINIC ORTHOPAEDIC CENTER CANNOT AND DOES NOT GUARANTEE THE ABSOLUTE SECURITY OF ELECTRONIC COMMUNICATIONS OR TRANSMISSIONS, SINCE ANY TRANSMISSION MADE OVER THE INTERNET BY ANY ORGANIZATION OR INDIVIDUAL RUNS THE RISK OF INTERCEPTION.

**LIMITATION OF LIABILITY**

**YOU ASSUME THE SOLE RISK OF TRANSMITTING YOUR INFORMATION AS IT RELATES TO THE USE OF THIS WEBSITE, AND FOR ANY DATA CORRUPTIONS, INTENTIONAL INTERCEPTIONS,**

CV-2024-04-1722
4/19/24, 12:16 PM

MICHAEL, KATHRYN

04/22/2024 14:41:42 PM

CMCO

Privacy - Crystal Clinic Orthopaedic Center

Page 101 of 104

Case: 5:24-cv-00907-CEF Doc #: 1-3 Filed: 05/22/24 101 of 104. PageID #: 122

INTRUSIONS OR UNAUTHORIZED ACCESS TO INFORMATION, OR OF ANY DELAYS, INTERRUPTIONS TO OR FAILURES PREVENTING THE USE OF THIS WEBSITE.

IN NO EVENT SHALL CRYSTAL CLINIC ORTHOPAEDIC CENTER BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL OR MONTARY DAMAGES, INCLUDING FEES AND PENALTIES IN CONNECTION WITH YOUR USE OF MATERIALS POSTED ON THIS SITE OR CONNECTIVITY TO OR FROM THIS SITE TO ANY OTHER SITE.

CRYSTAL CLINIC ORTHOPAEDIC CENTER MAY CHANGE THIS PRIVACY POLICY WITHOUT NOTICE TO YOU.

Other services provided by Crystal Clinic Orthopaedic Center on this Website may require you to agree to additional items.

**BY USING THIS WEBSITE, YOU ACCEPT THESE TERMS.**

**If you have any questions about our privacy policy or our use of information gathered through our Web site, please contact our Webmaster at [info@crystalclinic.com](mailto:info@crystalclinic.com).**

Last updated: 2/19/2016

Copyright © Crystal Clinic Orthopaedic Center. All Rights Reserved.



About Us      +

Locations      +

Services      +

Crystal Clinic is a physician-owned hospital system

© 2024 Crystal Clinic Orthopaedic Center

Terms and Conditions

Privacy

HIPAA Notice of Privacy Practices

Cookies Notice



Home / Cookies Notice

## Cookies Notice

The following describes technologies Crystal Clinic Orthopaedic Center may use when you visit and navigate the websites of crystalclinic.com and crystalplasticsurgeons.com or access their subdomains.

**Crystal Clinic is committed to full transparency and to protecting personal information.** We are providing this Cookies Notice so that you can fully understand how we may collect and store information on our online properties through the use of cookies, pixel tags, and local objects (collectively referenced as "Cookies" in this notification). You will find descriptions of why and how we use these Cookies and, of utmost importance, how you are always able to disable them if you so choose.

**What are Cookies?**
A Cookie is a small text file with a unique reference code that virtually every website uses to manage and optimize website usage. The web browser you use to access online sites stores a unique cookie within your device when you visit or use an online service. The browser then tracks and informs the site owner each time you return to that website.

There are two categories of Cookies:

- Session Cookies, which exist only as long as your internet browser is open. Once the browser closes, any Session Cookies expire.
- Persistent Cookies are stored on your device for longer periods.

Both types of Cookies can create an identification that is unique to your device.

Cookies may store certain information such as your internet protocol ("IP") address, operating system, device information, browser type and language, referring URLs, access times, pages viewed, links clicked, and other information about your activities or use of the online service. **Cookies used on Crystal Clinic websites and online properties DO NOT contain your protected personal health or medical information.**

**Types of Cookies**

- **Strictly Necessary Cookies** enable you to navigate the online service and use its features. These are essential but temporary Cookies used for technical purposes to enable the online experience, including the ability to access certain functionality and

online services. These functional Cookies exist only as long as your web browser or application is open.

- **Functional Cookies** allow us to save information that you previously entered so that you don't have to re-enter information each time you visit the website or access certain features. This can, but does not always, include information such as user names, language choices, and your location.
- **Performance Cookies** are persistent Cookies that are stored on your device and used to collect and track website visitor information that can help improve the performance of the website. Any gathered information is collected and stored in aggregate form (no individual information is retained). That combined information may inform the website owner about the number of visitors to a website, how many times a particular web page was viewed, how long a user stays on a given page, and other valuable website statistics. These Cookies are used only for the purpose of improving the performance of the user's website experience.
- **Analytics Cookies** are commonly used with web analytics services performed by third parties, such as Google Analytics. They use Cookies to collect basic information for the purpose of analyzing and measuring how visitors use online services and specific functions and features. The information gathered can include the IP address, device ID, browser information, geolocation, content viewed, or other similar information that can aid website analytics.
- **Marketing Cookies** can be used to deliver advertisements based on your unique interests and preferences. These Cookies are also used to collect data when you have interacted with our online advertisements. Data we collect for advertising or marketing purposes includes information such as IP address, browser type, location (only to the municipality level of detail), date and time of visit, domain type, and activity while on the website. We may use marketing Cookies to help measure the effectiveness of advertising efforts by tracking clicks from our ads to one of our web pages or other Crystal Clinic online content. Any information collected and used by third parties for statistical or analytical purposes are described in that third party's privacy policies and Cookies notices **NOTE: Crystal Clinic has elected not to use these types of Cookies to share any information with third party advertising or marketing partners to enable them to market to you. Nor do we permit any marketing partners to capture information that could be used to match and identify.**

### Why would Crystal Clinic use cookies?

As outlined above, Cookies are valuable to optimize your online experience while visiting a Crystal Clinic website or subdomain. Cookies help to build our knowledge of the kind of content you view so that we can continue to develop the website to make that information as convenient as possible and make your Crystal Clinic website experience better. They can help us customized content for you and streamline website navigation. Cookies can also be used to market specific Crystal Clinic products and services that we think you would be interested in, based on your interest and preferences while interacting with our website. That marketing can be presented while you are on our website as well as when you are on other websites or platforms based on your interests and preferences. Cookies can also help Crystal Clinic optimize its marketing messages to better fit you, your behaviors, and your preferences.

### It's Your Choice: Managing and Disabling Cookies

You always have the option to manage or disable Cookies at any time. That can be done in any of three ways:

Adjust your browser or device settings. Refer to the settings on your browser or the control panel of your device to manage your Cookie preferences). Please note that if you elect not to receive any Cookies, some of Crystal Clinic's online services may not be fully functional or available.

- Manage and disable Cookies on Google, Facebook, and Bing. Follow the guides provided in the Cookie policies and notices at each platform.
  - For Google, visit the Google Analytics Opt-out Browser Add-on Microsoft: privacy.microsoft.com/en-us/privacystatement Adobe: helpx.adobe.com/flash-player/kb/disable-third-party-local-shared.html Facebook: https://www.facebook.com/help/568137493302217 To remove yourself from some or all National Advertising Initiative (NAI) member advertising programs as further described in the NAI Opt-Out Page, please visit the NAI Opt-Out Page, https://optout.networkadvertising.org
  - You can learn more about how to block, disable or remove Cookies at www.allaboutcookies.org
- Manage your Cookie preferences on this Crystal Clinic website

**Updates**

Crystal Clinic Orthopaedic Center and Crystal Clinic Plastic Surgeons may add new services, new web page features, and may also add specific Cookies periodically without prior public notice. However, this Cookies Notice will be updated and posted online to keep site visitors informed of those changes, so please make a point to visit and review this Cookies Notice periodically.

About Us                                        +

Locations                                       +

Services                                        +

Crystal Clinic is a physician-owned hospital system

© 2024 Crystal Clinic Orthopaedic Center

Terms and Conditions

Privacy

HIPAA Notice of Privacy Practices

Cookies Notice